[No. S009038. Nov. 1, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD DEAN TURNER, Defendant and Appellant.

410

## Counsel

Robert M. Sanger, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Sara Gros-Cloren and Douglas C. S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BROWN, J.**—Defendant Richard Dean Turner appeals from his sentence of death under the 1978 death penalty law imposed on retrial after this court reversed the original judgment of death in *People v. Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669] (*Turner I*).

In *Turner I*, a jury had convicted defendant of the first degree murders of Merle and Freda Claxton (Pen. Code, § 187),[1] found true the "[s]pecial circumstance allegations that the murders were committed during [the] commission of [a] burglary (§ 190.2, subd. (a)(17)) and that [defendant] was

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

convicted of more than one offense of murder (§ 190.2, subd. (a)(3)),” and set the penalty at death. (*Turner I, supra,* 37 Cal.3d at p. 308.) We reversed the original judgment of death and set aside the special circumstance findings because the trial court failed to instruct on intent to kill as an element of the felony-murder and multiple-murder special circumstances. (See *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], overruled by *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) We, however, affirmed in all other respects.

Thereafter, defendant entered into a plea agreement over the objection of the prosecution. Under the agreement, defendant admitted that he intended to kill Merle and Freda Claxton and, in return, the trial court sentenced defendant to life without the possibility of parole. The People filed a petition for writ of mandate, seeking to vacate the sentence. The Court of Appeal granted the petition and issued a peremptory writ of mandate directing the trial court to vacate its order sentencing defendant to life without the possibility of parole and ordering the court to set the matter for trial. We denied defendant’s petition for review.

On retrial, the prosecution elected to proceed solely on the special circumstance allegation that defendant was convicted of more than one offense of murder with the specific intent to kill one or both of the victims. The jury found true the multiple-murder special-circumstance allegation. Following the penalty phase, it returned a verdict of life without the possibility of parole as to the first degree murder of Merle Claxton and a verdict of death as to the first degree murder of Freda Claxton. The trial court then denied defendant’s motion to modify the sentence. (§ 190.4, subd. (e).) Defendant’s appeal is automatic, and we affirm his sentence of death.

## I. Facts

### A. *Special Circumstance Phase*

The evidence on the retrial of the multiple-murder special-circumstance allegation largely paralleled the evidence introduced at defendant’s first trial and summarized in *Turner I.* Defendant and William Souza were roommates at a halfway house in Stockton. After being asked to leave the halfway house, defendant and Souza traveled to the Victorville/Apple Valley area to stay with defendant’s father. Upon arriving, defendant and Souza separated for a short time. During the separation, defendant stole some guns from his father. As a result, defendant and Souza could not stay with defendant’s father and stayed, instead, in an abandoned shack.

After a few days, defendant and Souza went to some hot springs in the Deep Creek area and swam and partied with some other people. While at the

hot springs, defendant and Souza drank multiple beers and smoked marijuana and "shermans"—cigarettes soaked in phencyclidine (PCP). They left the hot springs around 7:00 p.m. An intoxicated defendant drove Souza on a motorcycle but the motorcycle broke down. After defendant was unable to fix the motorcycle, defendant and Souza abandoned it and walked back to the shack. During the walk, defendant and Souza decided to burglarize a house for food. They eventually settled on the Claxtons' house because it was isolated and because it looked as if nobody was home.

As they approached the Claxtons' house, Souza told defendant to hide behind a bush. Defendant had a .22 rifle with him. Souza knocked on the door. When the lights came on and a dog barked, Souza became frightened and ran. He ran past defendant who looked "crazy," with his eyes bulging. Souza then heard three gunshots and returned to the house just in time to see defendant enter the house through a broken window. When Souza entered the house, the Claxtons' dog attacked him. He called for defendant's help, and defendant shot the dog. Souza then noticed the bodies of the Claxtons.

Defendant told Souza to "get the stuff [and] get the hell out of here." Souza complied because defendant pointed a gun at him and looked like he was "tripping" on PCP. Defendant and Souza began ransacking the house for items to sell and stuffed these items into the Claxtons' two cars.

Defendant and Souza each drove a car filled with items from the Claxtons' house to an isolated area by an abandoned chicken ranch. They left the car radios on as they tried to hide the items in the surrounding bushes. A nearby resident, however, saw defendant and Souza, and called the police. When defendant and Souza saw a police car approaching, they fled. The police discovered the two abandoned cars with stolen property in, on, and around the cars. The police also discovered four firearms, including the murder weapon.

After determining that the cars belonged to the Claxtons, the police attempted to locate them. The police eventually discovered the bodies of Merle and Freda Claxton and their dog at the Claxtons' house. An autopsy revealed that Merle Claxton had suffered two gunshot wounds—one in the chest and one in the face. The gunshot wound to the chest was probably the fatal wound. He also had abrasions and lacerations on his cheek and chest. The autopsy also revealed that Freda Claxton had died from a single gunshot wound to the head.

The police arrested defendant and Souza the next day by tracking their footprints from the location of the Claxtons' abandoned cars. At the time of his arrest, defendant was wearing Merle Claxton's hat.

At trial, a prosecution expert testified on the effects of PCP. He opined that it was highly unlikely that defendant and Souza could have committed the alleged acts, including the murders, burglaries, and escape attempt, if they were still under the influence of PCP.

In his defense, defendant presented only one witness—Dr. Rex Conrad, a psychologist. Dr. Conrad testified that defendant suffered from "schizophrenic reaction, paranoid type, chronic." During the direct examination, he also testified that defendant had an "impaired intent to kill." Dr. Conrad stated, "I think that he intended to kill these people," but believed that defendant "could not appreciate the gravity of the act." Dr. Conrad further testified that defendant told him that he killed the Claxtons because they were potential witnesses and he did not want to go back to prison.

### B. *Penalty Phase*

#### 1. *Prosecution*

Johnny Faye Lees testified that in 1976 defendant got in her car and pointed a gun at her. According to Lees, defendant told her to drive but she refused. Defendant then took her money. Although defendant expressed some concern that she might identify him, he left without touching her.

Dora Liberty testified that in 1976 defendant rang her doorbell at 6:00 a.m. When she opened the door, defendant pointed a gun at her. According to Liberty, she slammed the door shut and called the police, and defendant left after banging on the door.

Kenneth Wayne Knobbs testified that he shared a jail cell with defendant and several other inmates in 1979. After another inmate forced Knobbs to orally copulate him, defendant forced Knobbs to have sex with him. Defendant first tried to have anal intercourse with Knobbs and later forced Knobbs to orally copulate him.

#### 2. *Defense*

Defendant's mother, Bonnie Alice Ridgeway, testified that defendant was the third youngest of eight children, and that the family was poor. According to his mother, defendant had a skin problem, and everybody shunned him, including his brothers and sisters. She further testified that defendant's father would beat her in defendant's presence and used a belt or horsewhip to discipline defendant and the other children. She also acknowledged that she used a belt to discipline defendant. On one occasion, defendant's father placed defendant's brother, Jim, on a hot stove and burned him badly.

Defendant's mother divorced defendant's father when she learned that he had sexually molested their oldest daughter and that one of the children had seen him trying to have sex with the dog. When she had some financial problems, defendant, along with some of his siblings, went to live with their father.

Kathy, defendant's sister, testified that she and defendant were the "black sheep" of the family. According to Kathy, defendant had a skin problem and, as a result, had few friends. At the age of three, she was accidentally shot in the head by her brother Clyde in the presence of defendant. She also testified that their father used to beat the children, including her and defendant, with a belt until they cried. Her father also sexually molested her when she was five and raped her when she was 16. According to Kathy, she never told defendant about the rape but later discovered that he was awake when it happened.

Defendant's father, Ray Turner, testified that defendant was a problem child who always got into trouble and was difficult to raise. He admitted that he and defendant's mother used to beat defendant a lot, but only when he deserved it. He also acknowledged that he used a belt to punish defendant but denied ever using a horsewhip. He reluctantly admitted that he had sexually molested one daughter, but denied trying to have sex with the dog or raping his other daughter, Kathy. He testified that defendant came to live with him after the divorce because defendant's mother threatened not to feed the children any more. According to defendant's father, defendant always helped old people and wanted to help people in need.

James Turner, defendant's brother, testified that their mother did most of the disciplining and would mostly use a belt. At times, however, she would use a horsewhip. On one occasion, their mother hit defendant with a chair leg, and defendant could not use his arm for a couple of weeks. James also testified that he and his siblings had a tough life, and that every one of them tried to run away at least once.

Clyde Turner, defendant's brother, testified that their mother would use a belt or buggy whip to discipline the children. He also testified that their father would use a buggy whip to discipline the children. He further testified that he caught their father on his knees behind the dog with his penis exposed. According to Clyde, defendant was sometimes a discipline problem.

Von Turner, defendant's younger brother, testified that defendant had few friends as a child and did not take good care of himself. According to Von, their father would discipline them "instantly" and would "slug and hit and kick" the children. On one occasion, their father got upset at Von for locking the bathroom door and hit Von in the mouth and started kicking him in the presence of defendant—who tried to defend him. Von also described an incident where their father axed the heads off some kittens.

Dr. James Anthony Hawkins, a clinical psychologist, testified that he examined defendant at age 17 and thought that he was a "scared child." According to Dr. Hawkins, defendant feared bodily harm and was used to people "rejecting and treating him in a corrosive way." In fact, defendant had attempted suicide by hanging in 1976. Dr. Hawkins further testified that defendant had "serious pathological problems" but did not suffer from psychosis.

Dr. Craig Rath testified that defendant had low average intelligence and suffered from schizotypal personality disorder. According to Dr. Rath, because of his disorder, defendant seemed peculiar and was difficult to understand and, at the time of the murders, defendant was suffering from a "mental or emotional disturbance." Dr. Rath interpreted some of defendant's statements as an expression of remorse, but acknowledged that defendant tended to minimize his criminal history and intended to kill the Claxtons. He further opined that defendant would probably be able to keep to himself, continue working on his art, and stay in contact with his family but would not be productive beyond that.

Several correctional officers and counselors who worked on death row when defendant was there also testified. They testified that defendant was generally withdrawn and antisocial and had hygiene problems. They also testified that, aside from one minor incident where he threatened an officer because he was grumpy, defendant presented no discipline problems.

Finally, defendant briefly testified that he wanted to live so he could continue his artwork and stay in contact with his family.

### 3. *Rebuttal*

The prosecution presented no evidence in rebuttal.

## II. PRETRIAL ISSUE: REVERSAL OF GUILTY PLEA AND LIFE WITHOUT POSSIBILITY OF PAROLE SENTENCE

### A. *Facts*

Following our decision in *Turner I* reversing the special circumstance findings and the original judgment of death, the prosecution moved to strike the allegation that defendant intentionally killed Merle and Freda Claxton and the special circumstance allegation that the murders were committed during the commission of a burglary. The trial court granted the motion, leaving only

the special circumstance allegation that defendant was convicted of more than one offense of murder with the intent to kill one or both of the victims.

Thereafter, defendant filed a motion to strike the special circumstance allegation—which the trial court treated "as incorporating a petition for writ of habeas corpus." At a hearing on the motion, the court expressed concern that this court had reversed based on *Carlos* without adequately considering *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468]. According to the court, "*Green* stands for the principle that you cannot be convicted of a felony murder unless the underlying felony is independently charged and the defendant is independently convicted of that felony." Because the prosecutor, with the court's consent, dismissed the burglary and robbery charges prior to the first trial, the court speculated that *Green* could compel the reversal of defendant's murder convictions. In light of this concern, the court, rather than decide defendant's motion, offered to sentence defendant to life without the possibility of parole in exchange for defendant's admission of his intent to kill the Claxtons.

Defendant accepted the trial court's offer. Contending the court lacked authority to enter into a plea bargain without his consent, the prosecutor objected and moved to amend the information. Based solely on its concern that it might have to set aside defendant's first degree murder convictions, the court found that the prosecutor abused its discretion in objecting to the court's offer and concluded that it could proceed with the offer pursuant to section 1385. Following defendant's admission of his intent to kill and waiver of his rights under *Green*, the court sentenced defendant to life without the possibility of parole.

The People filed a petition for writ of mandate, seeking to vacate the order sentencing defendant to life without the possibility of parole. The Court of Appeal granted the writ, concluding that: (1) the People properly challenged the order by way of writ of mandate because the trial court exceeded its jurisdiction; (2) the trial court violated sections 1192.5 and 1192.7 by entering into a plea bargain over the objection of the prosecutor; (3) there was "no factual, legal or constitutional grounds entitling [defendant] to a writ of habeas corpus challenging his murder convictions"; and (4) the trial court abused its discretion under section 1385. The Court of Appeal then vacated defendant's sentence of life without the possibility of parole and ordered the trial court "to set the matter for trial as soon as practicable." We denied defendant's petition for review. Defendant was subsequently retried, resulting in the instant appeal.

### B. *Discussion*

Defendant contends the Court of Appeal erred in vacating the sentence of life without the possibility of parole (LWOP) despite his bargain with the trial court. According to defendant, this court should set aside the judgment of death and reinstate the LWOP sentence. We disagree.

Under the law of the case doctrine, " 'where, upon an appeal, the [reviewing] court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case . . . , both in the lower court and upon subsequent appeal . . . .' " (*People v. Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211], rejected on another ground as recognized in *People v. Bennett* (1998) 17 Cal.4th 373, 389, fn. 5 [70 Cal.Rptr.2d 850, 949 P.2d 947].) "The principle applies to criminal as well as civil matters" (*People v. Stanley* (1995) 10 Cal.4th 764, 786 [42 Cal.Rptr.2d 543, 897 P.2d 481] (*Stanley*)), including death penalty cases (*id.* at p. 787). "[A]nd it applies to this court even though the previous appeal was before a Court of Appeal [citation]." (*Id.* at p. 786.) We will not, however, apply the doctrine "where its application will result in an unjust decision, e.g., where there has been a 'manifest misapplication of existing principles resulting in substantial injustice.' "[2] (*Id.* at p. 787.) But "a mere disagreement with the prior appellate determination" is not enough. (*Ibid.*)

In this case, the Court of Appeal held that the trial court entered into an illegal plea bargain with defendant and vacated the LWOP sentence. In doing so, the court established the law of the case, and we are precluded from reexamining its decision absent an applicable exception. This is true even though we previously denied defendant's petition for review. (See *Stanley, supra,* 10 Cal.4th at p. 786.)

Based on defendant's arguments, the only exception that may apply is the unjust decision exception. But defendant does not and cannot establish that there has been a " 'manifest misapplication of existing principles resulting in substantial injustice.' " (*Stanley, supra,* 10 Cal.4th at p. 787.)

First, contrary to defendant's assertion, the Court of Appeal had the authority to entertain the People's petition for writ of mandate. Because a court "has no authority to substitute itself as the representative of the People in the negotiation process and under the guise of 'plea bargaining' to 'agree'

---

[2] In addition, we will not apply the doctrine where "the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations." (*Stanley, supra,* 10 Cal.4th at p. 787.) This exception does not, however, apply in this case because defendant alleges no intervening change in the law.

to a disposition of the case over prosecutorial objection" (*People v. Orin* (1975) 13 Cal.3d 937, 943 [120 Cal.Rptr. 65, 533 P.2d 193] (*Orin*)), "judicial plea bargaining in contravention of existing law are acts in excess of a court's 'jurisdiction' " (*People v. Superior Court (Himmelsbach)* (1986) 186 Cal.App.3d 524, 532 [230 Cal.Rptr. 890] (*Himmelsbach*), disapproved on another ground by *People v. Norrell* (1996) 13 Cal.4th 1, 7, fn. 3 [51 Cal.Rptr.2d 429, 913 P.2d 458]). As such, the Court of Appeal properly entertained the People's writ petition. (See *People v. Superior Court (Ludwig)* (1985) 174 Cal.App.3d 473, 475 [220 Cal.Rptr. 87] [holding that the court had authority to review an illegal plea bargain by way of a writ petition].)

Second, the Court of Appeal properly vacated defendant's LWOP sentence because there was an illegal plea bargain. In a plea bargain, "the defendant agrees to plead guilty in order to obtain a reciprocal benefit, generally consisting of a less severe punishment than that which could result if he were convicted of all offenses charged." (*Orin, supra,* 13 Cal.3d at p. 942.) The process requires the consent of the prosecutor (see § 1192.5; *Orin,* at p. 942), and the "traditional role of the [court] . . . is one of approving or disapproving" the bargain "arrived at by counsel for defendant and the" prosecutor (*People v. Superior Court (Smith)* (1978) 82 Cal.App.3d 909, 914 [147 Cal.Rptr. 554] (*Smith*)). If the court, however, enters into a plea bargain with the defendant over the objection of the prosecutor, it "contravene[s] express statutory provisions requiring the prosecutor's consent to the proposed disposition, . . . detract[s] from the judge's ability to remain detached and neutral in evaluating the voluntariness of the plea and the fairness of the bargain to society as well as to the defendant, and . . . present[s] a substantial danger of unintentional coercion of defendants who may be intimidated by the judge's participation in the matter." (*Orin,* at p. 943, fn. omitted.)

■ Here, the trial court negotiated an agreement with defendant whereby defendant agreed to admit that he intended to kill the victims and, in exchange, the court agreed to sentence defendant to LWOP—rather than death. In doing so, the court entered into a plea bargain, which required the consent of the prosecutor. (See *Orin, supra,* 13 Cal.3d at p. 943.) Because the prosecutor objected, the court exceeded its jurisdiction, and the Court of Appeal properly vacated the sentence. (See *Himmelsbach, supra,* 186 Cal.App.3d at p. 532.)

■ Defendant counters that the trial court merely gave defendant an "indicated sentence," which did not require the consent of the prosecutor. Defendant is wrong. Where the defendant pleads "guilty to all charges . . . so all that remains is the pronouncement of judgment and sentencing" (*Smith, supra,* 82 Cal.App.3d at p. 915), "there is no requirement that the People consent to a guilty plea" (*People v. Vessell* (1995) 36 Cal.App.4th 285, 296

[42 Cal.Rptr.2d 241]). In that circumstance, the court may indicate "what sentence [it] will impose if a given set of facts is confirmed, irrespective of whether guilt is adjudicated at trial or admitted by plea." (*Smith*, at pp. 915–916.) Here, the court did not give an indicated sentence because defendant's admission of the special circumstance allegation did not leave only "the pronouncement of judgment and sentencing." (*Id.* at p. 915.) Rather, the admission still left the penalty trial in which a jury must determine whether the appropriate punishment should be LWOP or death. (§ 190.3.) Defendant had "no state law right to waive [the] penalty trial by jury over the prosecution's objection." (*People v. Memro* (1995) 11 Cal.4th 786, 875 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) As such, "[t]he court could not constitutionally have granted defendant's request" to have the court sentence him "over the prosecutor's opposition." (*Ibid.*) Because the trial court erred in doing so, the prosecution did not violate any separation of power principles or improperly interfere with the court's power to impose a lawful sentence.

Finally, defendant contends the case was too emotionally and politically charged to permit a fair retrial and the resulting verdict of death was therefore unreliable. We, however, find nothing unfair or unreliable about the retrial, and defendant identifies no evidence to support his contention.

Thus, defendant does not and cannot establish that the Court of Appeal made an unjust decision by setting aside his LWOP sentence. And, because the court had a valid basis to set aside defendant's guilty plea, no double jeopardy violation occurred. (*People v. Massie* (1998) 19 Cal.4th 550, 565–566 [79 Cal.Rptr.2d 816, 967 P.2d 29].) Accordingly, defendant's contention fails.

### III. SPECIAL CIRCUMSTANCE ISSUES

#### A. *Griffin Errors*

Defendant contends the prosecutor improperly commented upon his failure to testify in both his opening and closing arguments in violation of *Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 85 S.Ct. 1229]. In *Griffin*, "the United States Supreme Court declared that the Fifth Amendment prohibits the prosecutor from commenting, either directly or indirectly, on the defendant's failure to testify in his defense." (*People v. Frye* (1998) 18 Cal.4th 894, 977 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*).) This prohibition does not, however, "extend to comments on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses." (*People v. Medina* (1995) 11 Cal.4th 694, 755 [47 Cal.Rptr.2d 165, 906 P.2d 2] (*Medina*).) Moreover, "brief and mild references to a

defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error." (*People v. Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776] (*Hovey*).) As explained below, we conclude that the statements cited by defendant either did not violate *Griffin* or were not prejudicial.[3]

### 1. *Opening Statement*

In his opening statement, the prosecutor told the jury that he was going to call Souza, a codefendant in the first trial, as a witness. To explain why he could do so, the prosecutor stated: "Well, how did this all come about? How did this happen? And in the first, the prosecution relied pretty much on what I've just told you, *because we did not have access to testimony from the defendants*. But in this first trial Souza testified in his own behalf. He was called by his own lawyer, a guy named Alan Spears. And Souza testified, and because he did so he waived his right to remain silent, and so now we can subpoena him."

According to defendant, the italicized statement was *Griffin* error. Defendant, however, failed to object or seek an admonition and therefore waived the error. (*People v. Hughes* (2002) 27 Cal.4th 287, 372 [116 Cal.Rptr.2d 401, 39 P.3d 432] (*Hughes*).) Recognizing this problem, defendant alleges ineffective assistance of counsel. But we find no prejudice here. The reference was brief and mild and did not suggest that the jury should draw an inference of guilt from defendant's failure to testify. Indeed, the prosecutor made the italicized statement solely to explain why he could now call Souza—a codefendant in the first trial—as a witness. The prosecutor's oblique reference to the lack of access "to testimony from defendants" at the first trial was therefore harmless beyond a reasonable doubt. (See *Hovey*, *supra*, 44 Cal.3d at p. 572.) Accordingly, we find no reversible misconduct and reject defendant's ineffective assistance of counsel claim. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052] [holding that to establish ineffective assistance of counsel, the defendant must demonstrate prejudice].)

### 2. *Closing Argument*

■ In his closing argument, the prosecutor sought to explain why he did not call his own psychiatric expert as a witness. "Mr. Smeltzer knows that I

---

[3] Defendant also contends the prosecutor's comments on defendant's failure to testify violated *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240]. *Doyle* "prohibits the prosecution from impeaching a defendant's trial testimony with evidence of the defendant's silence after the defendant, having been advised of his constitutional rights under *Miranda v. Arizona* (1966) 384 U.S. 436, . . . chooses to remain silent." (*People v. Earp* (1999) 20 Cal.4th 826, 856 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Because none of the comments refer, in any way, to defendant's post-*Miranda* silence, no *Doyle* error occurred.

have no ability to have my own psychiatrist exam[ine] his client. He knows that. So that's a counter—that's a little another red herring. [¶] *I don't have the opportunity to do that. He doesn't have to talk to me. I can't talk to him.* So that's a red herring. Don't get caught up with that." (Italics added.) According to defendant, the italicized statement was *Griffin* error. But, once again, defendant failed to object and therefore waived any error. (*Hughes, supra,* 27 Cal.4th at p. 372.) In any event, when viewed in context, the italicized statement referred to the prosecutor's inability to conduct a psychiatric examination of defendant—and not to defendant's failure to testify. (See *id.* at p. 375.) And, even if the brief comment was *Griffin* error, it was harmless beyond a reasonable doubt. (See *Hovey, supra,* 44 Cal.3d at p. 572.) Accordingly, we find defendant's contention meritless and reject his related claim of ineffective assistance of counsel predicated on his attorneys' failure to object to the alleged *Griffin* error.

### B. *Other Prosecutorial Misconduct*

In addition to the *Griffin* violations, defendant contends the prosecutor committed prejudicial misconduct on two other occasions during the special circumstance retrial. We conclude these contentions lack merit.

### 1. *Showing Photograph of Deceased Victims to Max Rehfeld*

During the examination of Max Rehfeld, the son-in-law of the Claxtons, the prosecutor showed Rehfeld a picture of Freda Claxton and the Claxtons' dog for identification. Defendant objected, and the trial court held a brief hearing in chambers. Defendant claimed that the photographs did not need to be shown to Rehfeld for identification because there was no dispute "about who the victims are." The prosecutor explained that there was a misunderstanding and that he had not realized that defendant had a problem with showing these photographs to Rehfeld. According to the prosecutor, if he had known of defendant's objections, he would have raised the issue with the court before showing the photographs to the witness. The parties then stipulated that the pictures in question showed the deceased victims and their dog.

Defendant contends the prosecutor's conduct violated both federal and state law because it unnecessarily gave the jury an opportunity to see Rehfeld's reaction to the photographs. The alleged misconduct was not, however, " ' "so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process" ' " and therefore did not violate the federal Constitution. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) The prosecutor's failure to seek a hearing before showing the photographs to Rehfeld appears inadvertent and

did not constitute the use of a "deceptive or reprehensible method[] to persuade" the jury. (*Frye, supra,* 18 Cal.4th at p. 969.) As such, no violation of state law occurred. In any event, there is nothing to suggest that Rehfeld reacted negatively to the photographs. And such a reaction, even if it had occurred, would not have been prejudicial in light of the overwhelming evidence of defendant's intent to kill both victims. This evidence included: (1) the physical evidence establishing that Merle Claxton was shot in the head and chest and that Freda Claxton was shot once in the head at close range; (2) testimony suggesting that defendant shot the victims in rapid succession; (3) defendant's admission to Dr. Conrad—his own psychological expert—that he killed the victims because they were potential witnesses and because he "had nothing to lose"; and (4) Dr. Conrad's opinion, elicited during his direct examination and cross-examination, that defendant intended to kill both victims. Accordingly, defendant's contention fails.

### 2. Sergeant Felix Damico's Testimony

During his examination of Sergeant Felix Damico, the prosecutor asked him: "Did you recently testify for Mr. Smeltzer [defendant's trial attorney] in a case?" Sergeant Damico answered: "I don't believe so. I'm not sure if I have or not." Defendant now contends the prosecutor committed prejudicial misconduct by improperly referring to evidence outside the record in an attempt to vouch for a witness. Defendant, however, failed to object or seek an admonition and therefore "waived the right to complain of any misconduct on appeal." (*Medina, supra,* 11 Cal.4th at p. 757.) In any event, we do not see how the prosecutor's question vouched for Sergeant Damico, given that the sergeant denied that he had previously testified on behalf of defendant's trial attorneys. (See *People v. Fierro* (1991) 1 Cal.4th 173, 211 [3 Cal.Rptr.2d 426, 821 P.2d 1302] [holding that the prosecutor's remarks, "viewed singly or in context," could not "reasonably have been interpreted as a personal endorsement of the state's witnesses"].) And the question, even if improper, was "not sufficiently serious to constitute prejudicial misconduct." (*People v. Sully* (1991) 53 Cal.3d 1195, 1236 [283 Cal.Rptr. 144, 812 P.2d 163].) Accordingly, defendant's contention fails.

### C. Use of Separate Juries for the Guilt and Special Circumstance Phases

■ Defendant contends the special circumstance retrial was unconstitutional per se. According to defendant, the second jury could not have known the legal basis for the first jury's findings and could have therefore construed the evidence in a manner inconsistent with those findings. Thus, the use of different juries to decide the murder and special circumstance allegations violated his constitutional rights. We have, in the past, rejected a similar

argument—that penalty retrials are unconstitutional per se. (See, e.g., *People v. Gurule* (2002) 28 Cal.4th 557, 645 [123 Cal.Rptr.2d 345, 51 P.3d 224].) And we see no reasoned basis for distinguishing between special circumstance retrials and penalty retrials. Accordingly, we reject defendant's contention.

### D. *Instructional Error*

■ The sole issue presented at the special circumstance retrial was whether defendant had the requisite intent to kill. In instructing the jury on this issue, the court explained: "In these special circumstances of which the defendant is accused in counts 1 and 2 of the information, a necessary element is the existence in the mind of the defendant of *the specific intent to kill one or both of the victims*." (Italics added.) The court later repeated these instructions: "To find the special circumstance referred to in these instructions . . . is true, it must be proved that the defendant . . . had *the specific intent to kill one or both victims*." (Italics added.) The verdict form mirrored these instructions.[4] Defendant now contends these instructions were erroneous because they permitted the jury to find the special circumstance to be true even if the jury did not unanimously agree on which victim defendant intended to kill.

Even assuming the instructions were erroneous, we conclude that any error was harmless beyond a reasonable doubt. (See *People v. Prieto* (2003) 30 Cal.4th 226, 256–257 [133 Cal.Rptr.2d 18, 66 P.3d 1123] (*Prieto*) ["an erroneous instruction that omits an element of a special circumstance is subject to harmless error analysis pursuant to *Chapman v. California* [(1967)] 386 U.S. 18, [24] [17 L.Ed.2d 705, 87 S.Ct. 824]"].) In this case, the evidence overwhelmingly established that defendant intended to kill both Merle and Freda Claxton. (See *ante*, at p. 422.) Thus, any alleged error in the trial court's instruction on the special circumstance was harmless beyond a reasonable doubt.

### IV. COMPETENCY ISSUES

In the midst of Dr. Conrad's testimony in the special circumstance retrial, defendant's trial attorneys moved for a competency hearing pursuant to sections 1367 and 1368. The trial court granted the motion and ordered a competency hearing. It later appointed new counsel for defendant solely for the hearing and three independent medical experts—Drs. Craig Rath, James Papen and Michael Kania—to examine defendant.

---

[4] The verdict form stated: "We, the jury in the above entitled action, find that the defendant has been convicted of more than one offense of murder in the first or second degree with the specific intent to kill one or both victims, to be TRUE."

At the competency hearing, which was tried before a separate jury, the three court-appointed experts testified that they believed defendant was competent to stand trial. All three experts independently agreed that defendant suffered from schizotypal personality disorder, but was not psychotic and did not suffer from schizophrenia. All three experts also agreed that defendant understood the roles of the judge, jury, prosecutor, and defense attorneys, and basically understood the legal process and his legal defenses.

Finally, the three experts independently agreed that defendant could assist his trial attorneys in conducting his defense. Dr. Rath acknowledged that defendant could be "difficult to understand," but concluded that defendant's attorneys could adequately communicate with defendant if they took the time and effort to understand him. Meanwhile, Dr. Papen found defendant's logic easy to follow and concluded that it was difficult—but not impossible—to communicate with defendant. Dr. Kania echoed these conclusions. At times, he had difficulties understanding defendant, but concluded that such difficulties were not unusual. He further concluded that defendant's attorneys would simply have to spend more time than usual in order to communicate with defendant.

Dr. Conrad, however, disagreed. Unlike Drs. Rath, Papen, and Kania, he diagnosed defendant as a paranoid schizophrenic and found that defendant fluctuated in and out of reality. Although he agreed that defendant understood the legal proceedings, he did not believe that defendant could adequately assist his attorneys in his defense. According to Dr. Conrad, defendant's speech was rambling and "didn't make sense," and his behavior was "bizarre and less than rational." As such, Dr. Conrad concluded that defendant could not rationally communicate with his attorneys.

Defendant's trial attorneys, Gary Smeltzer and Grover Porter, also testified at the competency hearing. Smeltzer testified that defendant was one of the strangest people he had ever seen. He acknowledged that defendant understood the legal proceedings and could follow directions, but claimed that he lacked the psychological training to understand defendant and could no longer communicate with defendant. While he acknowledged that it was theoretically possible for him to communicate with defendant with the aid of a psychologist, he claimed that the psychologist could not help defendant testify and that such an arrangement was impractical. Finally, he claimed that he did not raise the issue of competency until Dr. Conrad's testimony because the problem had been growing and Dr. Conrad finally confirmed his fear that defendant was no longer competent to stand trial.

Porter testified that he did not believe defendant was competent. He acknowledged that defendant understood the legal proceedings and could

follow directions, but claimed that he could not understand defendant and could not communicate with defendant. According to Porter, he had been concerned about defendant's competence from the beginning but did not raise the issue because he had deferred to the judgment of Smeltzer, the lead attorney.

Finally, the parties presented stipulated testimony from five duty sergeants and a registered nurse at the San Bernardino County jail. As stipulated, Duty Sergeant Sam Pollack testified that defendant was manipulative, seemed coherent, and acted "normal" in a jail setting. He further testified that defendant had set two fires in his cell in order to get moved because he feared that some other inmates were going to kill him. Duty Sergeant Michael Bayer testified that defendant seemed coherent and lucid and told the sergeant that he set the fires because he feared for his life. Duty Sergeant Tim Wilson testified that defendant asked to be moved because he feared for his life. According to Sergeant Wilson, defendant was very logical during their conversations and knew the system. Duty Sergeant Joseph Frank testified that he never had any problems with defendant, and that defendant seemed coherent and followed directions well. And Duty Sergeant Robert Ruff testified that defendant was very cooperative and a model prisoner. Finally, Nurse Violet Garday testified that defendant was not suicidal. According to Ms. Garday, defendant was coherent and caused no problems; he seemed to know the procedures and was always respectful and courteous.

The jury found defendant competent to stand trial.

A. *Sufficiency of the Evidence*

Defendant contends there was no substantial evidence to support the jury's finding that he was competent to stand trial. We disagree.

"A defendant is mentally incompetent . . . if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) "A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence." (*People v. Lawley* (2002) 27 Cal.4th 102, 131 [115 Cal.Rptr.2d 614, 38 P.3d 461] (*Lawley*).) "An appellate court reviews the record in the light most favorable to the jury's determination" (*People v. Marks* (2003) 31 Cal.4th 197, 215 [2 Cal.Rptr.3d 252, 72 P.3d 1222]), and determines whether substantial evidence supports the finding (*Lawley*, at p. 131). " 'Evidence is substantial if it is reasonable, credible and of solid value.' " (*Ibid.*, quoting *People v. Marshall* (1997) 15 Cal.4th 1, 31 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

Even a cursory review of the evidence adduced at the competency hearing reveals substantial evidence supporting the jury's finding of competency.

First, all witnesses, including defendant's own psychological expert and trial attorneys, agreed that defendant understood the nature of the criminal proceedings against him. Second, all three independent, court-appointed experts agreed that defendant, despite some communication problems, could adequately assist in his defense. According to these experts, although defendant was difficult to understand, he could adequately communicate with his attorneys if they spent enough time with him. Testimony from the officers and nurse at the San Bernardino County jail that defendant was cooperative, coherent, and followed directions corroborated the experts' conclusions. This evidence was more than sufficient to support the jury's finding.

Nonetheless, defendant contends we should disregard this testimony because the court-appointed experts failed to account for the practical realities of defending a death penalty case and the actual experience of defendant's trial attorneys. Even assuming defendant's contention has some merit, he ignores that we must view the evidence in the light most favorable to the jury's finding. (*Lawley*, *supra*, 27 Cal.4th at p. 131.) Viewed in that light, the evidence undoubtedly establishes that defendant and his attorneys could adequately communicate with each other and that defendant could adequately assist in his defense. Accordingly, we find substantial evidence to support the jury's finding.

### B. Admission of Evidence of Defendant's Prior Convictions and Death Sentence

According to defendant, the trial court erred in informing the jury of irrelevant, inflammatory, and prejudicial matters during the competency hearing. Specifically, defendant contends the court should not have informed the jury about the procedural history of the case, including: (1) defendant's two prior murder convictions; (2) the original special circumstance findings and judgment of death and their subsequent reversal by the California Supreme Court; and (3) the issue—whether defendant intended to kill the victims—being retried. Defendant further contends the prosecutor improperly introduced irrelevant, inflammatory, and prejudicial matters throughout the hearing by (1) commenting on defendant's prior convictions and judgment of death and the procedural history of the case during voir dire; (2) describing the underlying facts of the murders and the procedural history of the case in his opening statement; (3) introducing facts and evidence about the underlying murders and trial under the guise of questioning expert witnesses; and (4) commenting on the underlying facts of the murders in his closing argument. As will appear, we conclude that, even assuming trial court error and/or prosecutorial misconduct, no prejudice resulted.

As an initial matter, defendant failed to object to any of the foregoing statements by the trial court and prosecutor. He therefore "waived his objections for appeal." (*Medina, supra,* 11 Cal.4th at p. 726.)

Recognizing this hurdle, defendant contends the failure to object constitutes ineffective assistance of counsel. But defendant cannot demonstrate that his counsel's conduct, even if deficient, was prejudicial. (*Strickland v. Washington, supra,* 466 U.S. at p. 687.) Even assuming the trial court and prosecutor made improper references to the underlying case during the competency trial, there is no reasonable probability that, but for counsel's failure to object, the trial would have resulted in a more favorable outcome. Throughout the hearing, the prosecutor explained that his comments were not evidence, that the sole purpose of the hearing was to determine defendant's competence, that evidence of the crimes and the procedural history was introduced solely to demonstrate that defendant understood the proceedings and could relate the relevant facts to his attorneys and experts, and that the jury should not be prejudiced against defendant because of this evidence. Similarly, the trial court instructed the jury that its sole purpose was to determine defendant's competence—not his guilt—and that the prosecutor's comments were not evidence. In light of this and the fact that all three court-appointed experts independently reached the same diagnosis and agreed that defendant was competent, we see no prejudice to defendant. (See *Medina, supra,* 11 Cal.4th at pp. 726–727.)

We also reject defendant's contention that disclosing information about the procedural history of the case improperly diminished the jury's responsibility under *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]. As an initial matter, we question whether *Caldwell*—which held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"—applies in the competency context. (*Id.* at pp. 328–329.) In any event, the trial court accurately instructed the jury on its duties. We therefore find that the references to the procedural history of the case, even if improper, did not lead the jury to believe that responsibility for determining defendant's competence lay elsewhere. Accordingly, we reject defendant's contentions.

C. *Other Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct on numerous other occasions during the competency hearing. As explained below, we conclude that none of the alleged misconduct warrants reversal.

### 1. *Disparaging Defendant's Trial Attorneys*

#### a) *Facts*

During voir dire, the prosecutor highlighted the fact that defendant's trial attorneys only raised the competency issue in the middle of the retrial even though defendant had gone through a trial and numerous appeals over the past eight or nine years. The prosecutor further suggested that defendant's trial attorneys had become "emotionally involved with representing" defendant.

The prosecutor continued this theme in his opening statement. After describing the history of the case, the prosecutor stated: "Throughout all that time, throughout that first trial, there was never a motion like this. So why now?" Defendant objected. The trial court told the prosecutor to leave his "theory as to the reason behind [the competency motion] . . . for argument" and sustained the objection. Later in his opening statement, the prosecutor recounted Dr. Conrad's testimony during the special circumstance phase and then told the jury, "you have to ask yourself are Smeltzer and Porter using this as a gimmick." Defendant objected. The court sustained the objection and admonished the jury to disregard the prosecutor's statement. The prosecutor then continued, "What the evidence is going to show is that Porter and Smeltzer are not doing this for any negative reasons. They are doing this because they have a genuine concern. I know them both." Defendant moved for a mistrial but the court denied the motion. The court, however, admonished the jury to disregard the prosecutor's last statement.

During the hearing, the prosecutor elicited testimony from Dr. Rath acknowledging that defendant's trial attorneys were "duty bound" to raise the competency issue once Dr. Conrad raised the issue. Otherwise, counsel would be "incompetent."

The prosecutor also elicited testimony from Dr. Conrad acknowledging that his testimony during the special circumstance phase was probably devastating to the defense. Dr. Conrad further testified that defendant's trial attorneys had "serious concerns based upon [the doctor's] statements to them about" defendant's competence. And, in response to the prosecutor's question, "[W]hy now?," Dr. Conrad responded, "I don't know."

Finally, the prosecutor argued in his closing that defendant's trial attorneys only raised the issue of competency because of Dr. Conrad's testimony: "I submit to you that you would not have—you'd not be here, even now, if it had not been for Dr. Conrad's testimony on May 9th. It sort of put the defense attorneys in a box. They then would be found themselves to be

incompetent as attorneys if they didn't make the motion. [¶] They have to do that. And the court then has to appoint the panel, and we go through all the proceedings that we're in now. [¶] Mr. Smeltzer and Mr. Porter are friends of mine, as you know. And as you have seen. And I do not say that they're lying about their concerns."

He then suggested that defendant's trial attorneys erroneously believed that defendant was incompetent to stand trial because of their emotional involvement. "So you have to ask yourselves why does he [Mr. Smeltzer] feel the way he does? [¶] Well, you've got to understand, and you've seen all the evidence about how tough it is to defend these kind of cases. These are difficult cases. You feel, if you're the defense attorney, that you are the only thing standing between your client and the most, the strongest punishment available in our system. You've got his life in your hands. [¶] And that kind of stress really can affect your judgment sometimes. And you want to make sure you cover every base possible. You want to make sure you do every motion necessary and appropriate under the law. [¶] As I say, he's a good friend, and it's hard for me to criticize him as I'm doing now when I say that he's not lying, but he's guilty of some fuzzy thinking in this case."[5]

### b)  *Discussion*

Defendant contends the prosecutor committed misconduct throughout the competency hearing by suggesting that defendant's trial attorneys only raised the competency issue because they thought defendant was going to lose and that their emotional involvement in the case clouded their judgment. We disagree.

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." (*People v. Hill* (1998) 17 Cal.4th 800, 832 [72 Cal.Rptr.2d 656, 952 P.2d 673] (*Hill*).) "If there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury, misconduct would be established." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302 [18 Cal.Rptr.2d 796, 850 P.2d 1] (*Cummings*).) " 'An

---

[5] The prosecutor expounded on this theme throughout his closing. For example, he explained that: "Whenever you're a defense attorney and you care as Mr. Smeltzer and Mr. Porter do about doing your job as best you can, you almost have a tendency to put blinders on sometimes. You hope so much that you can do what you can for your clients that you sometimes ignore facts. You ignore the other stuff. . . . [¶] . . . And sometimes you have a situation where you are so dedicated and concerned about what you're doing, that you put blinders on as to the other facts. [¶] That's what's happening here." He later told the jury that defendant's trial attorneys believe defendant is "impossible to deal with" "because they are working with blinders on in this case. They care so much that they are trying to focus on the wrong thing and ignore the facts that we now have."

attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable.' " (*Hill,* at p. 832, quoting 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Trial, § 2914, p. 3570.)

As an initial matter, defendant waived most of these claims of prosecutorial misconduct because he failed to object or seek an admonition. (See *Cummings, supra,* 4 Cal.4th at p. 1302.) To the extent he did object during the prosecutor's opening statement, the trial court sustained his objections and admonished the jury to disregard the prosecutor's statements. Because these admonitions cured any impropriety or misimpression caused by the alleged misconduct, reversal is not warranted. (See *id.* at p. 1303.)

In any event, defendant's contentions fail on their merits. Because defendant's trial attorneys were percipient witnesses during the competency hearing and did not represent defendant for purposes of that hearing, the prosecutor was free to attack their credibility based on the evidence in the record. "The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence [and] to argue on the basis of inference from the evidence that a defense is fabricated . . . ." (*People v. Pinholster* (1992) 1 Cal.4th 865, 948 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Here, the prosecutor's arguments were fully supported by the evidence, which established that defendant's trial attorneys cared about defendant after representing him for so many years and had only raised the competency issue following adverse testimony by Dr. Conrad.

Moreover, a review of the prosecutor's comments establishes that they fall within the bounds of acceptable argument. First, viewed in their totality, the prosecutor's comments did not suggest that defendant's trial attorneys fabricated the competency issue because they thought defendant was going to lose. Indeed, the prosecutor went out of his way to avoid such an implication and consistently expressed his admiration and respect for defendant's trial attorneys. Second, the prosecutor's suggestion that the attorneys' judgment was impaired by their emotional involvement in the case did not amount to an attack on their integrity or rise to the level of an aspersion on their character. Thus, "it did not cross the 'line of acceptable argument, which is traditionally vigorous and therefore accorded wide latitude.' " (*People v. Sanders* (1995) 11 Cal.4th 475, 529 [46 Cal.Rptr.2d 751, 905 P.2d 420], quoting *People v. Fierro, supra,* 1 Cal.4th at p. 212.) Likewise, his claim of ineffective assistance of counsel predicated on the failure to object to this misconduct fails. (See *Strickland v. Washington, supra,* 466 U.S. at p. 687.)

## 2.  *Rose Bird Court References*

In his opening statement, the prosecutor twice referred to the "Rose Bird court" and stated that the "Rose Bird court" previously reversed the special circumstance findings and judgment of death in this case. Defendant contends these references constituted reversible prosecutorial misconduct. We conclude defendant's contention is meritless.

First, defendant failed to object or request an admonition, and nothing suggests that an objection would have been futile or that an admonition would have been inadequate. He therefore waived the claim. (See *Hill, supra,* 17 Cal.4th at p. 820.) Second, the contention fails on its merits. The prosecutor's two brief references to the Rose Bird court "did not constitute an egregious pattern of misconduct and did not infect the trial with unfairness." (*Prieto, supra,* 30 Cal.4th at p. 260.) And, even assuming the use of those references was somehow deceptive or reprehensible, we see no basis for concluding that the jury construed these references "in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].) As such, defendant's claim of prosecutorial misconduct fails. Likewise, his ineffective assistance of counsel claim predicated on the failure to object to this misconduct fails. (See *In re Visciotti* (1996) 14 Cal.4th 325, 351–352 [58 Cal.Rptr.2d 801, 926 P.2d 987] [holding that, to prevail on an ineffective assistance of counsel claim, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome"].)

## 3.  *Vouching for Witnesses*

### a)  *Facts*

During the competency hearing, the prosecutor, on various occasions, referred to his prior use of the court-appointed experts when he was a defense attorney and expressed his admiration and respect for these experts. For example, during voir dire, the prosecutor told the jury: "I have tremendous respect for some of these doctors as well. [¶] When I was a defense attorney I used some of them. As a prosecutor, I'm certainly pleased with the opinions that they're going to give." The prosecutor continued in his opening statement: "As I told you, I used to be a defense attorney for thirteen years and I called them myself; they're honest men. They're good psychologists who do a thorough job. So I was pleased when they were appointed."

During his examination of the expert witnesses, the prosecutor again reminded the jury that he had used these experts in the past when he was a

defense attorney. For example, he asked Dr. Rath: "[W]hen I was in private practice I frequently called upon you" to consult on the competence of a defendant? Dr. Rath answered, "[c]orrect."

The prosecutor also engaged in a similar colloquy with Dr. Kania:

"Q And you know me to have been a defense attorney for a lot of years, right?

"A Yes.

"Q In fact, I used to consult with you?

"A Yes. There were a few cases we worked on. [¶] . . . [¶]

"Q And you know me to have frequently consulted in the past with Doctor Rath?

"A Yes.

"Q And you know I have respect for your honesty and integrity, do you not?

"A Oh, thank you."

b) *Discussion*

Defendant contends the prosecutor improperly vouched for the credibility of the court-appointed experts by referring to his prior use of these experts and by openly expressing his admiration and respect for these witnesses. He, however, "failed to object, or seek an admonition, as to any of these remarks, and accordingly he cannot raise a claim of misconduct on appeal." (*People v. Anderson* (1990) 52 Cal.3d 453, 478 [276 Cal.Rptr. 356, 801 P.2d 1107].) Recognizing this hurdle, defendant also casts his claim of improper vouching as an ineffective assistance of counsel claim. We therefore review the merits of the claim, and we conclude that the prosecutor engaged in improper vouching but that defendant suffered no prejudice. Thus, reversal is not warranted.

A prosecutor may make "assurances regarding the apparent honesty or reliability of" a witness "based on the 'facts of [the] record and the inferences reasonably drawn therefrom.' " (*Frye, supra,* 18 Cal.4th at p. 971.) But a

"prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record." (*Ibid.*)

Here, the prosecutor vouched for the credibility of the court-appointed experts based on facts outside the record—i.e., his personal knowledge of these witnesses and his prior use of these experts when he was a defense attorney. (See *Medina, supra,* 11 Cal.4th at p. 757 [stating that improper vouching "usually involves an attempt to bolster a witness by reference to facts *outside* the record"].) He therefore committed misconduct. But "we find no reasonable probability that defendant was prejudiced by" this improper vouching. (*People v. Padilla* (1995) 11 Cal.4th 891, 946 [47 Cal.Rptr.2d 426, 906 P.2d 388], overruled on another ground in *Hill, supra,* 17 Cal.4th at p. 823, fn. 1.) The experts were court appointed, and their credibility and impartiality were never at issue during the hearing. Indeed, defendant's trial attorney, Mr. Smeltzer, and defendant's expert, Dr. Conrad, testified that they "respected" all of the court-appointed experts. Moreover, all three experts independently arrived at the same diagnosis and conclusion—that defendant was competent to stand trial. Under these circumstances, there is no reasonable probability that the prosecutor's improper vouching affected the verdict. Accordingly, defendant's claim of prosecutorial misconduct (see *Padilla,* at p. 946) and his related claim of ineffective assistance of counsel both fail (see *In re Visciotti, supra,* 14 Cal.4th at pp. 351–352).

### D. *Instructional Error*

At the close of evidence, the trial court instructed the jury that: "If [defendant] is found to be competent, his trial will resume. [¶] If [defendant] is found to be incompetent, he will not be released from custody and other proceedings will result." Defendant contends the court erred in giving this instruction because it permitted jurors to improperly speculate about what would happen to defendant if the jury found him incompetent. Defendant further contends the prosecutor "emphasized" and "exacerbated" the instructional error by arguing that defendant was trying to avoid responsibility for his crimes. According to defendant, the error is analogous to the error committed by a court when it fails to adequately inform the jury in the penalty phase that "a life sentence carries no possibility of parole." (*Shafer v. South Carolina* (2001) 532 U.S. 36, 51 [149 L.Ed.2d 178, 121 S.Ct. 1263].) As explained below, we find defendant's analogy unpersuasive.

As an initial matter, defendant's contention fails because he invited the error. "The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction." (*People v. Lucero*

(2000) 23 Cal.4th 692, 723 [97 Cal.Rptr.2d 871, 3 P.3d 248].) Here, defendant asked the court for an instruction informing the jury "of the consequences of a finding of incompetency." The prosecutor objected, but the trial court expressed an inclination to give such an instruction. Subsequently, defendant and the prosecutor agreed to the language of the instruction at issue here. Because defendant made a conscious and deliberate tactical choice to request the instruction, he cannot challenge it now. (*Ibid.*)

In any event, the instruction did not allow for improper speculation by the jury that defendant would somehow go unpunished if he were found incompetent, notwithstanding the prosecutor's argument that defendant was trying to evade responsibility for his crimes. Indeed, the instruction expressly stated that defendant would "remain in custody" if the jury found him incompetent. Moreover, the trial court instructed the jury that it should "reach a just verdict regardless of what the consequences of that verdict may be." As such, the instructions adequately informed the jury that defendant would not be immediately released if found incompetent and that the jury should not, in any event, consider that possibility.

■ Finally, defendant's reliance on case law requiring that juries in death penalty cases be informed that the defendant is ineligible for parole is misplaced. (See *Kelly v. South Carolina* (2002) 534 U.S. 246, 248 [151 L.Ed.2d 670, 122 S.Ct. 726]; *Shafer v. South Carolina, supra,* 532 U.S. at p. 51; *Simmons v. South Carolina* (1994) 512 U.S. 154, 169 [129 L.Ed.2d 133, 114 S.Ct. 2187] (plur. opn. of Blackmun, J.).) Unlike the jury in the penalty phase—which makes "the moral judgment whether to impose the death penalty" (*Shafer,* at p. 51)—the jury in a competency hearing exercises no sentencing discretion and merely resolves a factual inquiry—whether the defendant is competent to stand trial (see *ibid.*). Thus, "none of *Simmons'* due process concerns arise" in the competency context. (*Ibid.*) Indeed, we have recently declined to require an instruction informing a jury of the consequences of a finding of incompetence and see no reason to deviate from that decision. (*People v. Marks, supra,* 31 Cal.4th at p. 222.) Accordingly, we conclude that the instruction was neither erroneous nor prejudicial.

## V. PENALTY ISSUES

### A. *Prosecutorial Misconduct*

#### 1. *Reference to Inability to Cross-examine Defendant*

In the penalty phase, defendant made an allocution to the jury by answering three questions: (1) "[D]o you want to live?" (2) "Why?" and (3) "What would you hope to accomplish if the jury spared your life and you were to

spend the rest of your life forever in prison?" Defendant moved to limit cross-examination. The prosecutor objected, but the trial court limited cross-examination to the three questions and defendant's answers and precluded "cross-examination concerning the circumstances of the murder." The prosecutor then asked the court to instruct the jury on the reason for the limited scope of his examination. The court, however, declined to do so.

At the end of defendant's brief allocution, the prosecutor stated: "Based on the court's earlier ruling, I have no questions." Defendant then moved for a mistrial on the ground that the prosecutor's statement constituted reversible misconduct. The court denied the motion but offered to admonish the jury to disregard the impropriety. Defendant, however, declined the offer and stated that he was "not requesting" such an admonition. Defendant now contends the judgment of death should be reversed because of the prosecutor's misconduct. We disagree.

As an initial matter, defendant has waived the claim. " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*Prieto, supra*, 30 Cal.4th at p. 259, quoting *People v. Samayoa, supra*, 15 Cal.4th at p. 841.) Although defendant timely objected, he "expressly declined the court's offer to admonish the jury to disregard the prosecutor's remark. Because an admonition would have cured any harm, the failure to request an admonition renders the claim of misconduct unreviewable." (*People v. Silva* (2001) 25 Cal.4th 345, 373 [106 Cal.Rptr.2d 93, 21 P.3d 769].)

█ In any event, defendant's claim of prosecutorial misconduct fails on the merits. The brief reference to the trial court's ruling limiting cross-examination "did not constitute an egregious pattern of misconduct and did not infect the trial with unfairness" in violation of the federal Constitution. (*Prieto, supra*, 30 Cal.4th at p. 260.) And, even assuming the prosecutor's statement constituted a "deceptive or reprehensible method[] to persuade" the jury (*Frye, supra*, 18 Cal.4th at p. 969), "there appears to be no reasonable likelihood that the jury applied the prosecutor's inadvertent remark 'in an objectionable fashion,' and nothing in the record suggests otherwise" (*Prieto*, at p. 260, quoting *People v. Samayoa, supra*, 15 Cal.4th at p. 841). Accordingly, we reject defendant's contention.

### 2.  *Reference to Defendant's Lack of Remorse*

In his closing argument, the prosecutor commented on defendant's allocution and his failure to express any remorse. Specifically, the prosecutor stated:

"And he didn't get up here and tell you when he testified I'm really sorry about what happened. Please spare me 'cause I'm really remorseful. I'm really sorry. [¶] He didn't do that. The best they can even come close to that is Dr. Rath made some comment about, well, in his limited way he expressed some remorse. He said that they didn't deserve what came to them. They were innocent people. [¶] Is that real remorse? No. [¶] He didn't get up here and beg for his life because he had turned his life over to Jesus or whatever some people do. [¶] He simply got up and said he wanted to paint pictures of horses. I want to live so I can paint pictures of horses. [¶] Well, that's not enough as far as I'm concerned, ladies and gentlemen, for us to really want to give a man like that mercy for what he did."

■ In a less than lucid argument, defendant appears to contend the prosecutor's comments constituted *Griffin* error. (See *Griffin v. California, supra,* 380 U.S. at p. 615.)[6] Defendant also appears to contend the prosecutor's comments on defendant's failure to express remorse were improper. We conclude that neither contention has merit. Because defendant "did not remain silent at the penalty phase, the prosecutor's comments could not possibly have invited the jury to draw any adverse inference based on an invocation of the Fifth Amendment right against self-incrimination." (*Frye, supra,* 18 Cal.4th at p. 1019.) Likewise, the prosecutor's comments regarding defendant's lack of remorse were proper. (See *ibid.* ["the prosecutor is entitled to argue defendant's lack of evidence of remorse"].) Accordingly, defendant's claim of prosecutorial misconduct fails.

B. *Failure to Adequately Explain the Meaning of Life Without the Possibility of Parole*

1. *Facts*

At the close of evidence, the trial court instructed the jury on the two possible penalties. "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without the possibility of parole, shall be imposed on the defendant."

During deliberations, the trial court received the following three inquiries from the jury: (1) "We understand the sentence of life in prison without the possibility of parole to mean exactly what it implies. Does it?"; (2) "After being sentenced to LWOP, if the law changed, could a person so sentenced then be eligible for parole?"; and (3) "How does LWOP . . . differ from a sentence of life imprisonment?"

---

[6] Because none of the comments refer, in any way, to defendant's post-*Miranda* silence, we find no *Doyle* error. (See *People v. Earp, supra,* 20 Cal.4th at p. 856.)

The trial court held an unreported conference with the prosecutor and defendant's attorneys to discuss a response. Following the conference, the prosecutor opposed "any clarification or answer to . . . these questions" and preferred to have "the court instruct them that they are not to consider any of these factors." In the event the court decided to answer these questions, the prosecutor "proposed that at the very most we inform the jury that they are to assume for the sake of their deliberations that it means what it says with respect to question number 1 and instruct further that as to the other aspects of that question, along with the questions number 2 and 3, that they should not speculate about such matters." Defendant's attorneys stated that they were satisfied with the court's proposed response.[7]

The trial court then informed the prosecutor and defendant's attorneys that he would tell the jury to assume that LWOP means what it says and to advise them not to speculate or consider any other matters. Both the prosecutor and defendant's attorneys apparently agreed with the trial court's proposal and waived their right to be present when the court read its response to the jury. The trial court then entered the jury deliberation room and answered the first question by telling the jury: "For the purpose of your deliberations, you are to assume life without the possibility of parole means what it says." In responding to the second and third questions, the court told the jury: "As to those remaining questions, the court cannot instruct you further and you are not to speculate or consider such matters."

## 2. *Discussion*

Defendant contends the trial court's responses to the jury's questions failed to adequately inform the jury of his parole ineligibility in violation of due process pursuant to *Simmons v. South Carolina, supra,* 512 U.S. at page 169, and its progeny. (See, e.g., *Kelly v. South Carolina, supra,* 534 U.S. at p. 248; *Shafer v. South Carolina, supra,* 532 U.S. at p. 51.) We, however, conclude that no due process violation occurred.

As an initial matter, defendant waived the issue by failing to object and by apparently agreeing to the court's response to the jury's questions. (See *People v. Boyette* (2002) 29 Cal.4th 381, 430 [127 Cal.Rptr.2d 544, 58 P.3d 391] [holding that the defendant, who failed to object to the trial court's decision not to respond to the juror's note, "failed to preserve the issue for appeal, and, indeed, may be held to have given tacit approval of the trial court's decision"].)

---

[7] The record does not contain the court's proposed response. Because defendant's attorneys did not oppose the court's actual response to these inquiries, we presume the court's actual response was consistent with its proposed response.

In any event, defendant's contention fails on the merits. Under *Simmons* and its progeny, "whenever future dangerousness is at issue in a capital sentencing proceeding . . . due process requires that the jury be informed that a life sentence carries no possibility of parole." (*Shafer v. South Carolina, supra,* 532 U.S. at p. 51.) Here, defendant concedes that the jury instructions adequately conveyed defendant's parole ineligibility. (See *Prieto, supra,* 30 Cal.4th at pp. 270–271.) Instead, he claims that the trial court's responses to the jury's three questions created confusion about defendant's parole ineligibility in violation of due process. Defendant is wrong. By informing the jury that "life *without the possibility of parole*" (italics added) means "what it says," the court effectively told the jury that defendant would be ineligible for parole if the jury chose that sentence. The court then told the jury that it should not speculate about or consider any other matter, including the possibility that the law might change and make defendant eligible for parole. In doing so, the court not only adequately informed the jury about defendant's ineligibility for parole, it also spoke correctly. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1271 [74 Cal.Rptr.2d 212, 954 P.2d 475] [" ' "It is . . . incorrect to tell the jury the penalty of . . . life without possibility of parole will inexorably be carried out" ' "].) Accordingly, we find no due process violation.

## C. *Constitutionality of the Death Penalty*

Defendant urges this court to find the California death penalty statute unconstitutional because it is inherently immoral to kill a defenseless prisoner. Given that "the penalty phase determination 'is inherently moral and normative' " (*Prieto, supra,* 30 Cal.4th at p. 263), we decline to do so and leave decisions regarding the propriety of the death penalty to the Legislature and the People of the State of California.

Defendant also raises numerous other constitutional challenges to the California death penalty statute. We have, however, consistently rejected these challenges and see no reason to reconsider. Accordingly, we continue to hold:

(1) The statute adequately narrows the class of death-eligible offenders. (*Prieto, supra,* 30 Cal.4th at p. 276.)

(2) "Consideration of the circumstances of the crime under section 190.3, factor (a) does not result in arbitrary or capricious imposition of the death penalty." (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244] (*Brown*).)

(3) No written findings are required. (*Prieto, supra,* 30 Cal.4th at p. 275.)

(4) "The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*Brown, supra,* 33 Cal.4th at p. 401.)

(5) The jury need not be instructed on the burden of proof during the penalty phase because the sentencing function is "not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].)

(6) Intercase proportionality review is not required. (*Prieto, supra,* 30 Cal.4th at p. 276.)

(7) "The jury is not constitutionally required to achieve unanimity as to aggravating circumstances." (*Brown, supra,* 33 Cal.4th at p. 402.)

(8) "The jury may properly consider evidence of unadjudicated criminal activity involving force or violence under factor (b) of section 190.3 and need not make a unanimous finding on factor (b) evidence." (*Brown, supra,* 33 Cal.4th at p. 402.)

(9) "[T]he use of certain adjectives—i.e., ' "extreme" ' and ' "substantial" '—in the list of mitigating factors does not render the statute unconstitutional [citation]." (*Prieto, supra,* 30 Cal.4th at p. 276.)

(10) "The trial court is not required to instruct that certain statutory factors can only be considered in mitigation. [Citation.] Since there is no requirement that the court identify which factors are aggravating and which are mitigating [citation], neither must it restrict the jurors' consideration of the evidence in this regard. [Citation.]" (*Brown, supra,* 33 Cal.4th at p. 402.)

(11) The death penalty statute does not violate the equal protection clause and we decline to overrule *People v. Allen* (1986) 42 Cal.3d 1222, 1286–1288 [232 Cal.Rptr. 849, 729 P.2d 115]. (See *Brown, supra,* 33 Cal.4th at p. 402.)

D.  *Violation of International Law*

Defendant contends California's death penalty statute is unconstitutional because it violates evolving international norms of decency. Defendant further contends the statute violates the International Covenant on Civil and Political Rights (ICCPR). Even assuming defendant has standing to invoke the ICCPR (compare *Hanoch Tel-Oren v. Libyan Arab Republic* (D.D.C. 1981) 517 F.Supp. 542, 545–547 [holding that the defendant lacked standing

to challenge the death penalty based on the ICCPR because treaties only apply to disputes between sovereign governments] with *United States v. Duarte-Acero* (11th Cir. 2000) 208 F.3d 1282, 1286 [holding that "[t]he clear language of the ICCPR manifests that its provisions are to govern the relationship between an individual and his state"]), we have recently rejected defendant's contentions and decline to reconsider our decision to do so (see *Brown, supra,* 33 Cal.4th at pp. 403–404).

### E.   *Constitutionality of Delay in Executing Defendant*

Defendant—who was convicted of the two first degree murders in 1980—contends the over 20-year delay in his execution constitutes cruel and unusual punishment under the federal and state Constitutions and in violation of international law. We have recently rejected a similar contention in *Brown, supra,* 33 Cal.4th at page 404, and see no reason to reexamine this conclusion.

### VI.   DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.