Filed 12/30/14  P. v. Edhammer CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>JOHNATHAN EDHAMMER,<br><br>　　　　Defendant and Appellant. | A138850<br><br>(San Mateo County<br>Super. Ct. No. SC071274) |

### INTRODUCTION

A jury convicted defendant Johnathan Edhammer on charges he sexually molested his niece, K.Doe, between January 2007 and April 2010 when she was between eight and 11 years old, and he was between 18 and 21 years old.  Defendant contends the judgment should be reversed because (1) the trial court failed to instruct the jury with CALCRIM Nos. 358 [Evidence of Defendant's Statements] and 359 [Corpus Delicti], and (2) his trial counsel provided ineffective assistance by preventing him from testifying on his own behalf and failing to object to the prosecutor's comment on his failure to testify.  Finding no merit in these contentions, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In an information filed on July 2, 2010, the San Mateo County District Attorney (DA) charged defendant with the following offenses against the same victim, K. Doe, born in November 1998:  committing a lewd or lascivious act (oral copulation) on a child under the age of 14 years by means of force, violence or duress on or about April 7, 2010

(Pen. Code, § 288, subd. (b); count one)[1]; committing a lewd or lascivious act (oral copulation) on a child under the age of 14 years on or about April 7, 2010 (§ 288, subd. (a); count two); committing a lewd or lascivious act (placing victim's hand on his penis) on a child under the age of 14 years on or about April 7, 2010 (§ 288, subd. (a); count three); committing a lewd or lascivious act (placing victim's hand on his penis) on a child under the age of 14 years on or about April 6, 2010 (§ 288, subd. (a); count four); committing a lewd or lascivious act (placing victim's hand on his penis) on a child under the age of 14 years between November 21, 2009 and November 28, 2009 (§ 288, subd. (a); count five); committing a lewd or lascivious act (placing victim's hand on his penis) on a child under the age of 14 years between November 21, 2009 and November 28, 2009 (§ 288, subd. (a); count six); committing a lewd or lascivious act (placing victim's hand on his penis) on a child under the age of 14 years between July 1, 2009 and September 1, 2009 (§ 288, subd. (a); count seven); committing a lewd or lascivious act (placing victim's hand on his penis) on a child under the age of 14 years between July 1, 2009 and September 1, 2009 (§ 288, subd. (a); count eight); continuous sexual abuse (involving three or more acts of lewd or lascivious conduct) of a child under the age of 14 years between January 29, 2007 and June 30, 2009 (§ 288.5, subd. (a); count nine). Also, the DA alleged with respect to count one that the offense was a serious felony (§ 1192.7, subd. (c)(5)), a violent felony (§ 667.5, subd. (c)(5)), and that defendant committed the offense by use of force, duress, or violence (§ 1203.066, subd. (a)(l)). In addition, the DA alleged on all counts that the offenses were serious felonies (§ 1192.7, subd. (c)(6)), violent felonies (§ 667.5, subd. (c)(6)) and that the offenses involved substantial sexual conduct with a child under the age of 14 years (§ 1203.066, subd. (a)(8)[2]).

---

[1] Further undesignated statutory references are to the Penal Code unless otherwise noted.
[2] With the exception of count one, which alleged a violation of Penal Code section 1203.066, subdivision (a)(1).

2

Counsel delivered opening statements at trial on May 24, 2012. In his opening statement, defense counsel began his remarks by stating, "Johnathan Edhammer will testify in this case and will tell you that none of these allegations are true. And Johnathan, by so testifying, will expose himself to cross-examination by a skilled prosecutor, and you will be the judge as to whether or not Johnathan is telling the truth."

## I. *Prosecution Case*

The prosecution presented five witnesses: Miriam Wolf, a licensed clinical social worker; A. Doe, K.'s mother; K.Doe (the victim); Abigail W., K.'s school friend, and Sergeant Thomas Clements, the Clearlake police officer who initially interviewed K. regarding her allegations of sexual abuse.

Wolf testified as an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS). She described the characteristics of CSAAS in general terms and did not answer any hypothetical questions based on the case at bar. Wolf explained CSAAS is not a diagnostic tool; rather, it is a set of characteristic responses noted in sexual abuse victims by treating physicians, some of which run counter to general expectations. On a timeline, CSAAS posits that a young victim of sexual abuse goes through several stages, beginning with feelings of having to keep the abuse secret, of helplessness to the abuse, of entrapment in the abusive situation, then accommodation of the abuse, and, finally, delayed, conflicted, and unconvincing disclosure of the abuse. According to Wolf, the import of the literature on CSAAS is to help practitioners and lay persons understand information presented by child victims of sexual abuse; for example, by explaining why victims do not immediately disclose even severe abuse.

K.'s mother, A.Doe, testified she and her husband, T., lived in Clearlake with their three children: K. (13), J. (8), and N. (5) (the Doe children). T. has been a Clearlake police officer since 1995. T.'s biological mother is Carol Edhammer, who lives with her husband, Wayne Edhammer, in Half Moon Bay (the Edhammers), a three to four-hour drive from Clearlake. Defendant is the Edhammers's son and T.'s half-brother, although

3

they did not grow up together. Defendant lives with his parents in Half Moon Bay. As well as defendant and his parents, Gary Moore (defendant's cousin) and his wife Trish, Christina Edhammer (defendant's older sister), Kenneth Edhammer (defendant's older brother), and Laurel Rucker (defendant's girlfriend) also lived at the Edhammers's home in Half Moon Bay during the relevant time frame.

A. testified how K. typically spent vacations in Half Moon Bay. From 2007 until 2010, the Doe children stayed with their grandparents in Half Moon Bay during spring break, Thanksgiving break, a week of Christmas break, and from one to three weeks during the summer break. Sometimes A. and her husband would drop the children off and pick them up later, and sometimes the Edhammers would meet them halfway and take the children from there. Around the time K. was eight years old, Amada began to notice K. would be "more emotionally clingy" when she returned from her visits with her grandparents; A. attributed this to "separation anxiety." K. visited her grandparents in April 2010 (when she was 11 years old) during spring break and returned to school on Monday, April 12. The next day, A. received a call from the school about K. When she arrived at the school, she found K. in a classroom surrounded by her friends and a teacher; K.'s face was red and she was sobbing uncontrollably. On the way home, A. parked at the side of the road and insisted K. tell her why she was so upset; for the first time, K. told her what "had really been going on between her" and defendant.

K. testified about the sexual abuse perpetrated upon her by defendant during the times she went to Half Moon Bay to stay with her grandparents. On one of the visits, when she was eight years old, defendant first abused her, and the abuse continued on subsequent visits. What happened the first time was repeated on future occasions: Defendant grabbed one of K.'s special stuffed animals and ran upstairs into his room with it. K. chased after him to get her stuffed animal back. Once she was in the bedroom, defendant closed and locked the door, and refused to give her toy back "until I did stuff." Defendant sat or lay on the bed and told K. to sit beside him. After K. sat on the bed

4

beside him, defendant grabbed her hand, put it under the blanket, and placed it on his penis. Defendant made her close her hand around his penis and then he moved it in an up-and-down motion. This lasted for a couple of minutes. Afterwards, defendant would reveal where he hid the stuffed animal and give it back to K. K. was scared when this happened and did not yell out because she thought defendant might hurt her, as he was much bigger than she. Defendant told her in "a deep . . . and really scary" voice not to say anything about what happened. Defendant repeated this same pattern of abuse on multiple occasions during K.'s subsequent visits to her grandparents' house when she was between the ages of eight and 10 years old.

On K.'s final visit to her grandparents' house during spring break in April 2010, when she was 11 years old, something different happened. This time, after defendant grabbed her stuffed giraffe and ran to his room, he took a pocket knife from the bedside table and said he would cut up the stuffed animal unless she did what he wanted. The giraffe was very special because K.'s dad won it for her in Reno; she felt scared and she wanted it back. After K. put her hand under the blanket as instructed by defendant, he refused to return the toy and told her "there's more." Defendant told her she had to "put it in my mouth." Defendant then pushed her head under the blanket and onto his penis; at first, K. kept her mouth shut, but she was scared and wanted to leave so she "did it to get it over with." Afterwards, defendant handed her the giraffe and said, "You can leave." That was the last time K. saw defendant prior to testifying at trial.

On cross-examination, K. testified that even though her father is a police officer, she did not tell him about the ongoing abuse because he would have called her a liar. In regard to her visit to her grandparents' house during spring break in 2010, K. admitted that on April 7, 2010, the day she was forced to orally copulate defendant, she posted on Facebook, "Had soooooo much fun today. We played on the Slip and Slide and had a water balloon fight." K. also retracted her statement to the police that defendant had placed her hand on his penis and attempted to make her orally copulate him on the day

5

before the water balloon fight, stating, "[n]othing happened" that afternoon because she, defendant, and his girlfriend went out to lunch in San Mateo. Also, K. could not remember what time of year it was when the first incident of abuse occurred in 2007 and could not say who exactly was living in the house at that time.

Abigail W. testified she and K. have been lifelong friends and have been in school together since fourth grade. In April 2010, K. was talking with Abigail and another friend in front of Miss Tallifero's classroom during school recess when she told them that her uncle John had been sexually molesting her. K. was crying hard and her body was shaking as she told them about the molestation. K. did not want them to tell their teacher, Ms. Tallifero, but the two friends decided that was the "right thing to do."

Sergeant Thomas Clements testified about his role in the investigation. Around 3:00 p.m. on the afternoon of April 13, 2010, Clements went to the Doe's house on a report of possible child molestation. When he arrived, K. was on the couch in "a sitting, fetal position." K. was crying and it took Clements several minutes to calm her down to the point he could interview her. Clements interviewed K. only briefly because she was so timid and reluctant in talking about the specifics of the abuse that he decided to arrange a forensic child interview. A few days later, Clements watched the forensic child interview on closed-circuit television conducted by Denise Hingeclip from the DA's office. During this interview, K. described the sexual abuse she suffered while staying with her grandparents.

Clements also testified about how he guided K. in placing a pretext call to defendant from the Clearlake police station on the afternoon of April 22, 2010.[3] Clements provided K. with a script of what to say if defendant answered the call. The script specifically used the word "penis," but K. was too embarrassed to use that word and instead referred to defendant's penis as his "you-know-what." During the pretext

_____

[3] The prosecutor played a recording of the pretext call to the jury during her opening statement, before K. took the stand, and again during closing argument.

6

phone call, defendant initially said he did not know what K. was talking about when she accused him of making her "touch your you-know-what." Later in the conversation, defendant asked where K. was calling from and whether she was alone. Defendant also told K., "I'm not going to do it anymore I promise. I swear." He apologized for "upsetting" her and stated, "I didn't mean anything by it. It was just a joke."

## II. *Defense Case*

Defense counsel presented a series of witnesses who were living at or visiting the Edhammers's house in Half Moon Bay during the relevant time period. Both Wayne and Carol Edhammer testified for the defense, as did Gary and Trish Moore, Kenneth and Christina Edhammer, Laurel Rucker, and Jenna Mathews, a teenage girl whose mother is a good friend of Carol Edhammer and the family, and who spent time during summer vacations at the Edhammers's home. Through their testimony, defense counsel sought to undermine and cast doubt on K.'s allegations of sexual abuse by showing how K. enjoyed playing sports with defendant; liked being around him, and had a great relationship with him; children were closely supervised in the Edhammers's home; K. often spent time alone in defendant's room; so much was going on in the house that the abuse described by K. could not have occurred; and, defendant's responses in the pretext call were not referring to sexual abuse.

For example, Trish Moore testified the interaction between defendant and the Doe children was "always fun" and defendant loved to play catch, wrestle, and horseplay with them on the lawn. One day she saw K. in defendant's room; the door was wide open, no one else was in the room, and K. was sitting at the foot of the bed with a computer in her lap. Trish told K. she was not supposed to be upstairs, but K. did not budge. The same thing happened on another occasion. Gary Moore also testified he saw K. in defendant's room on several occasions with the door open, just sitting on the bed playing video games or watching TV. Christina Edhammer testified K. "always seemed happy [while visiting at the Edhammers's house], she loved coming down with us, she loved hanging out with

7

us. We'd play games, she always seemed very happy." K. "loved hanging out" with defendant, and he would play basketball and soccer with her. Kenneth Edhammer testified he noticed nothing unusual about K. during her visit in April 2010; she was always happy to see him when he got home from work. Jenna Mathews testified she stayed with the Edhammers for two weeks in the summer of 2009, and one week coincided with the Doe children's visit. Jenna testified the children were not allowed to go upstairs, but she saw K. upstairs several times using her laptop in the guest bedroom subsequently occupied by the Moores; Jenna never saw defendant upstairs with K. and never saw her with any kind of stuffed animal; K. did not strike Jenna as the "kind of kid who was very much attached to a stuffed animal"—"if anything, she was attached to the computer."

Defendant's girlfriend, Laurel Rucker, testified she moved into the Edhammer home in December 2009 and shared a bedroom with defendant until he was arrested. Laurel testified regarding the events during spring break in April 2010. When Laurel and defendant were together, K. always wanted to "hang out" with them; K. was "competing" with Laurel "for that seat next to Johnathan." When defendant instructed K. in basketball and other sports as a coach, he was "a little tough" and "wasn't taking it easy on her." During that time, Laurel never left defendant's side because she is "just clingy" and always wanted to be with him; there was never a time that week where defendant disappeared into their bedroom with K.

Wayne and Carol Edhammer also testified in defendant's defense. Wayne testified that during Thanksgiving in 2009, there were between 25 and 28 family members and friends at the house. He never noticed a problem between defendant and K. during that Thanksgiving holiday. During K.'s visit during spring break in April 2010, Wayne counseled defendant about being too hard on K. after observing her demeanor when the children returned from the park one day. Wayne told defendant, "Take it easy. She's ten years old. . . . You kick too hard. Don't be so rough." Carol testified she had a

8

house rule that children were not allowed upstairs because she needed "to see what they're doing. They're in my care." Carol stated it was not possible that defendant and K. could be upstairs in his bedroom for 20 to 30 minutes without her noticing their absence. Carol also had a rule there was to be no running in the house and she was certain she never saw K. and defendant play a game where one chased the other upstairs. Within a couple of days of K.'s visit over spring break in 2010, Carol received an "instant message" through Facebook from K. saying she wanted to come and live with her.

## III. *Closing Arguments and Verdicts*

On May 30, 2012, the court instructed the jury, neither party objected to the instructions as read, and thereafter counsel presented closing arguments. In her closing argument, the prosecutor reviewed the elements of the charges and the evidence supporting each charge. The prosecutor told the jury, "I am asking you to find the defendant not guilty" on count four, which was alleged to have occurred on April 6, 2010, noting: "K. said, 'Now that I think about it, I don't think anything happened on 4/6.' " The prosecutor asked for guilty verdicts on all other charges and allegations.

Defense counsel began his argument as follows: "I told you in . . . my opening fairly emphatically that Johnathan Edhammer was going to testify. Now I was not misleading you. I assure you. As you can probably figure out, trials are dynamic events which sometimes unfold in ways that even old lawyers can't predict. And when this trial unfolded and we heard the testimony of K., who testifies flat-out nothing happened on April 6th. . . . [¶] And, quite frankly, as I will demonstrate to you through her testimony, . . . 'Nothing happened on April 7th.' Which take[s] care of three of the other charges. [¶] And . . . her testimony about the summer of 2009, which there are several counts about that, is so vague and unclear. And we presented credible evidence to show nothing happened in the summer of 2009." Counsel also stated he had presented credible evidence, including "writings of [K.] herself," showing nothing happened during Thanksgiving 2009. Further, counsel argued that, because the evidence showed "none of

9

these charges are valid," defendant had only to plead "not guilty," adding, "[t]here is no need beyond that to have Mr. Edhammer get up and say, not guilty, I didn't do these things." Counsel also reminded the jury the court had instructed it that defendant has a constitutional right not to testify.

The jury delivered its verdicts on the morning of May 31, 2012. The jury acquitted defendant on count four (alleged to have occurred on April 6, 2010) and counts five and six (alleged to have occurred over Thanksgiving 2009). The jury found defendant guilty on all other counts. The jury also found true allegations defendant used fear or force as to count one and that counts two, three, seven, eight, and nine involved substantial sexual contact.

## IV. *Post-Trial Proceedings*

On October 4, 2012, defendant filed a petition for access to juror identifying information for the purpose of developing a motion for a new trail. Defendant subsequently filed a motion for a new trial pursuant to section 1181 on the grounds he was prevented from exercising his Fifth Amendment right to testify, jurors improperly considered the fact he did not testify, and the prosecution committed *Griffin*[4] error by commenting on his failure to testify.

The court held a hearing on defendant's motion for a new trial on March 29, 2013. Defendant's trial counsel, Charles Smith, testified that his legal career began in 1976. He spent almost 10 years in the District Attorney's Office trying homicide cases. Smith started his own practice in 1992 and since then had tried civil and criminal cases; he estimated he had conducted 50 to 70 felony jury trials, including between 10 to 20 sexual assault or child molestation cases. Smith testified he had no specific recollection of advising defendant on his Fifth Amendment rights. However, in preparing for

---

[4] (*Griffin v. California* (1965) 380 U.S. 609, 615 ["Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."].)

10

defendant's trial and at opening statements, Smith believed defendant would need to testify to beat the charges. Smith prepared defendant to testify by talking to him about what questions he would ask in direct examination and also hired an experienced criminal defense attorney to conduct a mock cross-examination. Defendant did poorly on the mock cross-examination. Smith testified his strategy shifted during trial for several reasons: he did not think the prosecutor really "hammered . . . home" the pretext call; he thought his cross-examination of K. established certain counts could not have occurred at the times alleged; and at his daily, post-trial debriefing sessions, defendant and his parents agreed he was "scoring a lot of points" and "we had many counts which . . . it would be impossible for a jury to convict upon because she wasn't there or he wasn't there." Smith suggested to defendant and his parents there was no need for defendant to testify and no one disagreed. In fact, Smith had a "vivid recollection of Wayne saying to me I don't think Johnathan ought to testify. And that was obviously confirming to me what I also believed." Consequently, Smith advised defendant not to testify because the "DA is going to hang you with the pretext call" and "skewer you with those statements. [¶] . . . literally line by line" with "almost impossible to explain statements." Further, responding to defendant's declaration he wanted to testify but Smith told him he could not, Smith stated that "just did not occur. And that's the kind of thing that I would remember if it had occurred." In that regard, Smith added his customary practice when a client wants to testify against his advice is to "make a memo to the file" that he advised the client not to testify. But Smith never had to do that with defendant because he and his father agreed he should not testify.

Juror number 11 (Juror 11) was examined by the court and testified he was surprised defendant did not testify at trial. Juror 11 stated if he was "in that situation I would want to testify if I truly believed I was innocent." Nevertheless, Juror 11 stated defendant's decision not to testify "did not influence my decision at all" and that he was mindful during deliberations of the court's instruction on the matter.

11

Wayne Edhammer testified he never opined to Smith defendant should not testify. At lunch on the day Wayne testified, Smith stated, "I have my hung jury," but defendant insisted, " 'I want to testify to say my side.' " Jeffrey Spruitenburg testified he is a friend of the family and was present at Smith's lunchtime meetings with the family during trial. Spruitenburg stated defendant was adamant he wanted to testify but Smith "just said, 'I'm not putting him on. No point.' " Defendant's aunt, Denise Votruba, and defendant's girlfriend, Laurel Rucker, testified to the same effect.

Defendant testified Smith never explained to him he had a right to decide whether or not to testify. Defendant stated he was unprepared for the mock cross-examination because he had not yet seen the transcript of the call. Afterwards, he told Smith he still wanted to testify because he could "explain everything that happened in the context [sic] call." At that point, Smith agreed defendant would testify. However, on the last day of trial, just after the lunch recess, Smith told defendant he would not be testifying.

After testimony and argument of counsel, the court ruled from the bench on the new trial motion. Preliminarily, the court ruled there were no grounds for a new trial based on jury misconduct or *Griffin* error. On the Fifth Amendment issue, the trial court found: "Mr. Smith to be the more credible on the general discussion about the whole subject of testifying and not. Whether he recalls exact details of the moment or not, his description of the discussions, the considerations, the reason why Mr. Edhammer might be better off to not testify, all of that rings true as to how these things generally occur . . . ." The court noted it was "not a great idea" to tell the jury defendant would be testifying, and "[i]t did have to be explained away" after he did not testify; however, Smith "explained it away relatively artfully . . . ." The court also found defendant's testimony was "self-serving" and "hard to believe," and that defendant understood the ultimate decision on whether to testify or not was his choice. Accordingly, the court denied the new trial motion and set the matter for sentencing.

12

At a sentencing hearing on April 11, 2013, the court sentenced defendant to the low term of three years on count one and, pursuant to section 654, did not impose a sentence on count two. As to count nine, the court sentenced defendant to the low term of six years consecutive to count one. Also, the court imposed six-year terms on counts three, seven, and eight to run concurrently with counts one and nine, for a total aggregate term of nine years imprisonment. Defendant filed a timely notice of appeal on May 31, 2013.

## DISCUSSION

### A.      *CALCRIM Nos. 358 & 359*

Defendant contends the trial court erred by failing to instruct the jury sua sponte with CALCRIM Nos. 358 and 359. We address each instruction in turn.

CALCRIM No. 358 [Evidence of Defendant's Statements] instructs the jury that evidence of a defendant's out-of-court oral incriminating statements must be viewed with caution.[5] The trial court has a sua sponte duty to give the cautionary instruction unless the defendant's incriminating statements are written or tape recorded. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200; *People v. Mayfield* (1997) 14 Cal.4th 668, 776.) The admonition applies only to incriminating statements made by a defendant. (*Ibid.*)

Here, the tape-recorded pretext call between K. and defendant was played to the jury, and it contained statements by defendant that the prosecution argued were incriminating. Under these circumstances, the trial court arguably should have instructed with CALCRIM No. 358, omitting the cautionary portion of the instruction because defendant's statements were recorded. However, any omission by the trial court on this

---

[5] CALCRIM No. 358 states: "You have heard evidence that the defendant made an oral statement before the trial. You must decide whether the defendant made any such statement, in whole or in part. If you decide that the defendant made such a statement, consider the statement, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement. [¶] Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

13

point "does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. [Citations.]" (*People v. Beagle* (1972) 6 Cal.3d 441, 455-456, superseded on other grounds as stated in *People v. Rogers* (1985) 173 Cal.App.3d 205, 208–209.)

Moreover, the main purpose of the instruction is to assist the jury in determining if the statement was in fact made by the defendant (see *People v. Stankewitz* (1990) 51 Cal.3d 72, 94; *People v. Bemis* (1949) 33 Cal.2d 395, 400), and there is no doubt on that point because the statements were recorded and defendant did not challenge their authenticity at trial. In addition, the court gave other instructions on how the jury should determine the credibility of witnesses' statements and testimony and evaluate conflicting evidence, such as CALCRIM Nos. 226 [Witnesses], 302 [Evaluating Conflicting Evidence], and 318 [Prior Statements as Evidence].

Accordingly, in light of the other instructions given to the jury to assist them in evaluating witness credibility, the fact the statements were recorded and considering the evidence as a whole, we conclude that it is not reasonably probable that defendant would have achieved a more favorable result if a limited version of CALCRIM No. 358 had been given in relation to defendant's recorded statements. (See *People v. Dickey* (2005) 35 Cal.4th 884, 905–906.)

Turning to CALCRIM No. 359 [Corpus Delicti: Independent Evidence of a Charged Crime],[6] when a defendant's extrajudicial statements form part of the prosecution's evidence, the trial court must instruct the jury sua sponte that "a finding of

---

[6] CALCRIM No. 359 provides in pertinent part: "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] . . . [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

14

guilt cannot be predicated on the statements alone. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1170.) However, "[e]rror in omitting a corpus delicti instruction is considered harmless, and thus no basis for reversal, if there appears no reasonable probability the jury would have reached a result more favorable to the defendant had the instruction been given. [Citations.] [¶] . . . [T]he modicum of necessary independent evidence of the corpus delicti, and thus the jury's duty to find such independent proof, is not great. The independent evidence may be circumstantial, and need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues. [Citations.] If, as a matter of law, this 'slight or prima facie' showing was made, a rational jury, properly instructed, could not have found otherwise, and the omission of an independent-proof instruction is necessarily harmless." (*Id.* at p. 1181.)

Here, the trial court's failure to instruct on the corpus delicti requirement was harmless because K.'s testimony alone fully established the corpus delicti independently of defendant's statements in the recorded pretextual call. In this regard, K. testified defendant molested her several times in various manners and this evidence alone was sufficient to establish the crimes had been committed against her. Defendant stresses K. recanted her allegation defendant molested her on April 6, 2010, and that her testimony was vague and contradictory on the other instances of molestation. However, the jury took all that into consideration, as shown by the fact the jury found defendant guilty on some counts and not guilty on others. In sum, we conclude it is not reasonably probable an outcome more favorable to defendant would have resulted had the trial court instructed with CALCRIM No. 359. (See *People v. Alvarez, supra,* 27 Cal.4th at p. 1181.)

**B.** *Ineffective Assistance of Counsel*

The familiar standards governing ineffective assistance claims are as follows: "To prevail on a claim of ineffective assistance, a defendant must show both that counsel's

performance was deficient—it fell below an objective standard of reasonableness—and that defendant was thereby prejudiced. [Citation.] Such prejudice exists only if the record shows that but for counsel's defective performance there is a reasonable probability the result of the proceeding would have been different. [Citation.] To prevail on a claim of ineffective assistance on appeal ' " 'the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission.' [Citation.]" ' [Citation.]" (*People v. Cash* (2002) 28 Cal.4th 703, 734.)

Defendant contends trial counsel was ineffective in failing to object to a *Griffin* violation when the prosecutor allegedly commented on his failure to testify.  Defendant bases this claim on the following comments by the prosecutor during her rebuttal:  "The defense does not try—don't worry, I'm not going to play it again—the defense, you're going to have, by the way, not going to listen to it again, you're not going to do that again because you've already heard it enough times. There is no explanation. There was none given, nothing to rebut my arguments how he said he's sorry six times. Never clarifies even after she says, You made me touch your you-know-what. What else could that possibly mean, ladies and gentlemen? What else can it mean? And for all the guys on the jury, seriously, a girl is calling to say you made me touch your penis? Not in that exact word. Your reaction is going to be, what are you talking about? So the question is—and I come back, if you will, to beyond a reasonable doubt."

" '[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.' [Citation.] The prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide. [Citation.] The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. [Citation.]" (*People v. Brady* (2010) 50 Cal.4th 547, 565–566.)  Here, the prosecutor's comments were clearly referring to defendant's failure during the recorded pretext call to contest in any way K.'s allegation

16

that he made her touch his penis, as well as defense counsel's failure during closing argument to offer any explanation for why defendant repeatedly apologized during the pretext call. As such, the prosecutor's remarks were valid "comments on the state of the evidence" and thus did not constitute *Griffin* error.[7] (*People v. Brady, supra,* 50 Cal.4th at p. 566.)

Defendant also asserts ineffective assistance of counsel on the grounds his trial counsel unlawfully prevented him from testifying at trial on his own behalf. There appear to be four components to defendant's ineffective-assistance claim: (1) trial counsel was ineffective in failing to prepare defendant to testify; (2) trial counsel was ineffective in misadvising defendant about his right to testify; (3) trial counsel was ineffective in promising the jury defendant would testify and thereby prove his innocence; and, (4) trial counsel was ineffective in resting the defense case without calling defendant as a witness.

The trial court heard evidence at the hearing on defendant's motion for a new trial on the issues of whether trial counsel was ineffective in misadvising defendant about his right to testify and whether trial counsel was ineffective in promising the jury defendant would testify and thereby prove his innocence. A trial court's ruling on a motion for a new trial is reviewed under the deferential, abuse-of-discretion standard. (See *People v. Lightsey* (2012) 54 Cal.4th 668, 729 [stating the trial court's ruling on a new-trial motion " ' "is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion" ' [Citation.]"].) " 'Deferential review is particularly necessary when . . . the factual determination depends

---

[7]  Moreover, even if the prosecutor's brief comments in rebuttal towards the end of a lengthy closing argument could be viewed as a tangential reference to defendant's failure to testify, any resulting error would be harmless. (See *People v. Turner* (2004) 34 Cal.4th 406, 419-420 [" '[B]rief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error.' [Citation.]".)

in part on judging a witness's credibility,' and we must uphold such a determination if it is supported by substantial evidence. [Citation.]" (*People v. Rabanales* (2008) 168 Cal.App.4th 494, 509.) We cannot reweigh the evidence, as the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. (Evid. Code, § 312.)

After receiving and considering the evidence presented on the motion for new trial, the court determined defendant's attorney testified credibly, had valid tactical reasons for advising defendant not to testify, and satisfactorily explained to the jury why, contrary to his remarks during his opening statement, defendant would not be testifying after all. The court also found counsel had advised defendant the decision to testify was ultimately defendant's and defendant understood the choice was his. The court's credibility determination and factual findings are amply supported by substantial evidence presented at the hearing on the motion for a new trial, as adduced above.

In sum, the record establishes counsel's decision to advise defendant not to testify after telling the jury he would testify was the product of an informed tactical choice by counsel and lay well within the range of reasonable competence. Thus, counsel's decision provides no basis for defendant's claim that he was denied effective assistance of counsel.[8] (See *People v. Avena* (1996) 13 Cal.4th 394, 444 [reviewing court should be careful not to second-guess the wisdom of such tactical choices when considering a claim of ineffective assistance of counsel].)

---

[8] In light of our conclusion counsel's advice to defendant not to testify was an informed tactical choice and well within the range of reasonable competence, defendant's claim counsel was ineffective in preparing him to testify is moot.

**DISPOSITION**

The judgment is affirmed.[9]

_____
Dondero, J.

We concur:

_____
Humes, P.J.

_____
Margulies, J.

---

[9] By separate order filed this date, we summarily deny the petition for writ of habeas corpus in case no. A143633, which appellate counsel filed on the same day as oral argument and which asserts claims of ineffective assistance of trial counsel in support of the claims raised on appeal.