Filed 10/22/25  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ROBERTO ALVARADO RODRIGUEZ, Defendant and Appellant. | F088905 (Super. Ct. No. F15901340) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt and William Terrence, Judges.

Jeffrey R. Wood, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

In February 2016, a jury convicted defendant Roberto Alvarado Rodriguez of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); count 1), leaving the scene

of an accident (Veh. Code, § 20001, subd. (a); count 2), and misdemeanor battery (Pen. Code, § 242; count 3) in connection with an incident during which defendant had a confrontation with a supermarket employee.  In November 2024, the court sentenced defendant to two years on count 1 (Pen. Code, § 245, subd. (a)(1)) and two years on count 2, to be served concurrently with defendant's sentence on count 1.

Defendant contends the prosecutor engaged in prejudicial misconduct and the cumulative effect of the errors prejudiced him requiring dismissal or reversal.

We affirm.

## FACTUAL BACKGROUND

Defendant was charged with committing assault with a deadly weapon, to wit, a vehicle, on J.S. in November 2014 (Pen. Code, § 245, subd. (a)(1); count 1), leaving the scene of an accident (Veh. Code, § 20001, subd. (a); count 2), and battery (§ 242; count 3).

### *Prosecution Evidence*

J.S. was working the check-out registers as a head clerk, a managerial position, at a Save Mart store in Kingsburg at around 10:30 a.m. on November 24, 2014.  In his position, J.S. was tasked with "running the front end department when needed," which meant managing the cash register and overseeing the checkers and service specialists. That day, defendant walked up to J.S. at the register with a carton of milk or dairy product.  J.S. recognized defendant from previous interactions with him.  Defendant wanted to exchange the carton.  J.S. asked defendant if he had a receipt and defendant stated he did not.  J.S. noticed the carton defendant wanted to exchange was half empty, it was not expired, and the new carton defendant wanted to exchange it for "was only a day different."  J.S. told defendant that he could not exchange it because it was half empty and he did not have a receipt.  According to J.S., defendant "got irate from the beginning."  "He started yelling profanities right from the get-go, calling [J.S.] a racist," saying he was going to sue J.S. for all he had, and further stating he was going to contact

2.

the corporate office and have J.S. fired. J.S. asked defendant to calm down and to leave several times but defendant "kept at it." At one point defendant pulled out his phone, put it in J.S.'s face and tried to take a picture, saying he was going to use it against J.S. J.S. went to move the phone out of his face and told defendant "not to do that" and "to get out of the store" and that "he's not welcomed here anymore." Defendant "grabbed the open [dairy] container … and threw it at [J.S.]" The carton hit J.S. in the face and the liquid splashed on him. Defendant grabbed his bag and ran out to his car. J.S. and a bagging clerk followed defendant. J.S. explained he wanted to get the make and model of defendant's car and his license plate number to report him. Defendant got in his car, which he had backed into a parking spot with the front facing out. According to J.S., the back of the vehicle was "completely clear." J.S. approached the back of the car, approximately a foot and a half to two feet away, but there was no rear license plate. J.S. then went to the front of the car to see if it had a front license plate; it did not. J.S. testified he looked up at defendant and defendant "looked straight at [him] and rammed his car right into [J.S.]"; "[t]here was no hesitation whatsoever." The car's bumper hit J.S.'s knees and shin area and he fell forward onto the hood. Defendant "accelerated hard" and J.S. ended up falling off onto his back and hitting his head. Defendant drove off and did not come back. As a result of being hit, J.S. had lower back pain and a bump on his head. He went to physical therapy for several months and testified that he still had back pain at the time of trial.

J.S. testified he had previously encountered defendant at a Save Mart store in Fresno. Defendant ran a hair salon in the same shopping center and he would regularly frequent the Save Mart. Some of J.S.'s interactions with defendant were civil, while "the majority of them were not the greatest." Defendant "was well-known at that store for not being the nicest person, being rude," and J.S. had "a situation with him in the past." J.S. had just finished his shift at 1:00 a.m. and was in his car letting it "warm up" when defendant approached him. J.S. rolled down his window a little and defendant "flipped

3.

out" and was cursing, asking J.S. why he was shining his lights in his direction. J.S. was confused and asked defendant what he was talking about; he explained he was just letting his car warm up before leaving. Defendant responded, "'I don't give a crap. I don't give a shit. You don't shine your lights in my direction.'" J.S. told defendant to get away from his car and to leave him alone. Defendant threatened "to kick [his] ass at one point" and eventually walked away. J.S. called the police on his way home.

R.M. was working as a service clerk and cashier at Save Mart on November 24, 2014. At around 10:30 a.m. that morning, R.M. was helping a customer put her groceries in her car and collecting carts to bring inside. She saw J.S. walking behind a customer. R.M. saw the customer get in his car, a black BMW, start it, and then accelerate forward, hitting J.S. J.S. went forward onto the hood and then rolled off to the left side onto the ground. The driver did not stop or slow down; he kept going and drove fast out of the parking lot. Another witness, J.H., was driving in the parking lot that day and also saw a black BMW hit J.S. and drive away at a high rate of speed.

### Defense Evidence

Defendant testified on his own behalf. He admitted to committing a petty theft offense in 2007. He testified, on November 24, 2014, he went to Save Mart to try to return "a bad-dated" quart of half-and-half. He approached the first open register and J.S. was behind the counter. Defendant stated he "politely" asked "if it was possible for him to exchange the product." J.S. "immediately responded with a very harsh attitude and asked, 'You got your receipt with you?'" Defendant responded that he lost his receipt but he just wanted to exchange the product for a new one. J.S. said, "'I'm not going to exchange anything for you. Get out of my store.'" Defendant "was very aggravated." He "felt humiliated and confused and shocked" at the treatment. He denied being rude or mistreating J.S. Defendant asked to speak to a store supervisor because he "did not deserve to be mistreated like that." J.S. patted his own chest and said, "'I am the manager, and there's nothing you can do. Now get out of my store.…'" Defendant got

4.

frustrated and tried to take a picture of J.S.'s name tag but J.S. covered it and pointed to the exit. Defendant admitted splashing some of the dairy product on J.S.'s apron before walking away. Defendant denied hitting J.S. in the face with the carton. J.S. chased defendant, so defendant started to run to his car. Another individual was following behind J.S. and defendant felt "scared" and "threatened." Defendant got in his car and locked the door. J.S. tried to open the door but he could not because it was locked.[1] J.S. then got in front of defendant's car and appeared "very enraged and paranoid," saying, "'Call the police.'" Defendant turned on his engine, asserting there was "space in the back of [his] car and space sufficient on the left side of [his] car." J.S. moved to the left and defendant decided to "leave going around him." Defendant denied touching J.S. with his hands or his car. He moved his car forward to the right, moved around J.S. and then went to the left and drove away. He looked back and saw J.S. standing and waving one arm in the air and holding his phone to his ear with his other hand while screaming, "'Call the police.'"

Defendant recalled a previous incident in October 2013 during which he interacted with J.S. Defendant was a business owner and was closing down his business between midnight and 1:00 a.m. He saw a vehicle parked across the street from his business with its high beams on for 15 minutes; no other cars were in the parking lot. Defendant testified he felt "[s]cared" and "[t]hreatened." He explained, two weeks earlier his car had been vandalized. Defendant took some bags of trash out and approached the car before he was going to call the police. Defendant "asked politely" what the individual, J.S., was doing with his headlights pointed at defendant's business at that time of night. Defendant mentioned that his car had been vandalized two weeks prior. J.S. told

---

[1]In rebuttal, R.M. testified she saw J.S. and the bagging clerk following defendant and they never touched him. She also stated J.S. never tried to open the door to defendant's car; rather, "[t]hey weren't near the doors." J.S. also denied trying to open defendant's car door or getting close to him.

defendant he worked at the Save Mart and defendant "went back to [his] business." Defendant denied threatening J.S. or using profanity during the interaction and stated his "custom is not to use bad words."

The parties stipulated to the admission of video surveillance from the Save Mart store in Kingsburg on November 24, 2014, showing defendant walking inside the store, interacting with J.S., and exiting the store thereafter, and the video was admitted into evidence. They also stipulated that defendant is the owner of a black, four-door, 2006 BMW 3 Series sedan with a specific VIN number that he has owned since March 31, 2014, and that he drove to the Save Mart store in Kingsburg on November 24, 2014.

The jury found defendant guilty of all the charges on February 11, 2016. However, defendant failed to appear at the originally scheduled sentencing hearing of March 14, 2016. He next appeared in court over eight years later, on October 7, 2024. The court sentenced defendant to the low term of two years in prison for the assault with a deadly weapon (count 1) and a concurrent term of two years for leaving the scene of an accident (count 2). It also sentenced defendant to 69 days at the Fresno County jail for count 3 with credit for time served.

## DISCUSSION

### I. Prosecutor Did Not Engage in Prejudicial Misconduct

Defendant argues the prosecutor committed prejudicial misconduct by calling defendant a liar and improperly vouching for the prosecution's witnesses.

#### A. Relevant Background

During the prosecutor's closing argument, the prosecutor asserted that defendant hit J.S. with the carton of dairy product. She argued, "It's caught on videotape. It's right there for you to see. He can't really lie about that. But what he can lie to you about is what happens in the parking lot, assault with a deadly weapon with his car. There's no

6.

videotape of that.  [¶] So he can stand here and look you in the face and lie to you and tell you that that did not happen, and I hope you saw through that.”

In discussing J.S.’s resulting injuries after the incident, the prosecutor stated, “Photos were taken immediately after the incident.  Thankfully [J.S.] didn’t suffer any broken bones.  He didn’t suffer permanent disabilities.  He had bruising.  By mercy of God, he didn’t sustain—.”  At that point, defense counsel objected as “Improper appeal to emotion.”  The court overruled the objection.  The prosecutor continued, “By mercy of God, this man was saved.  He had some bruising, but it was not visible that same day.”

Later in closing argument, the prosecutor asserted that defendant “lied to you.”  The prosecutor cited defendant’s statement that he “went around” J.S. and “would not do that to a human or an animal,” when discussing whether defendant hit J.S. with his car.  The prosecutor argued, “He would not do that to a human or an animal, but he can physically attack a person with an object.”  The prosecutor also noted defendant’s statement that it was his custom “not to use bad words,” and asserted, “It’s not his custom, but hurling an object at another person is his custom?  He has stolen before.  This man is a thief.  Look at him.  He’s dishonest.”  Defense counsel objected without stating a specific basis for the objection, and the court overruled the objection.  The prosecutor then continued:  “He was dishonest when he stole somebody’s property, and he’s dishonest now.  He lied to you under penalty of perjury.  And he takes the stand and tells us he’s a changed man.  He wants you to believe what he says.  Once a thief, always a thief.  A theft has everything to do with dishonesty, and this is a dishonest man.  There are three witnesses who independently contradicted him.”

The prosecutor discussed the jury instruction on witness credibility noting, “If you consider that a witness has committed a crime or other misconduct, you may consider that fact in evaluating the credibility of the witnesses’ testimony.”  The prosecutor then argued:  “Again, it’s his word versus these three independent witnesses.  Witnesses who have pristine backgrounds.”  Defense counsel objected and the court overruled the

objection. The prosecutor continued, "Witnesses who have not stolen before." Defense counsel again objected, asserting "[f]acts not in evidence" and the court overruled the objection. The prosecutor continued, "Upstanding citizens, hard-working members of our community. And look at him. A person who has the biggest motive to lie, to deliver self-serving statements just so he could avoid being held accountable for his crimes."

In rebuttal, the prosecutor argued in part: "This defendant is a liar. Okay? However you slice it, his statements are misleading, and he wants you to believe the incredible, fantastical story that all these witnesses are out there to get him, they're framing him, and that the assault never happened. We know he's lying because he made some inconsistent comments and statements under penalty of perjury when I cross-examined him."

### B.    Applicable Law

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Mendoza* (2007) 42 Cal.4th 686, 700; *People v. Farnam* (2002) 28 Cal.4th 107, 167; *People v. Hill* (1998) 17 Cal.4th 800, 819.) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*People v. Mendoza*, *supra*, at p. 700.) "'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'" (*People v. Hill*, *supra*, 17 Cal.4th at p. 820.)  An exception is made if a timely objection or request for admonition would have been futile, or if "'"an admonition would not have cured the harm caused by the misconduct."'"  (*Ibid.*)  "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.'" (*People v. Green* (1980) 27 Cal.3d 1, 27, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 241.)

We review a trial court's ruling on prosecutorial misconduct for abuse of discretion, asking whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion.  (See *People v. Dworak* (2021) 11 Cal.5th 881, 910; *People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

### C.    Analysis

Defendant contends several of the prosecutor's statements in closing argument amounted to misconduct.  As discussed *post*, we conclude the challenged comments either did not amount to misconduct or were not prejudicial.

#### 1.    The prosecutor's comments about defendant's veracity did not constitute misconduct

Defendant argues the prosecutor committed misconduct by repeatedly calling defendant a liar.  He asserts the prosecutor did not argue defendant's testimony was a lie, but that defendant himself was a liar.  He also alleges it was misconduct for the prosecutor to insinuate he committed perjury.  He further contends, "arguing to the jury that by looking at [defendant], a thief, makes him dishonest is akin to propensity evidence in a round-about way, and [is] not related to the specific acts alleged as required."

9.

Initially, we note defense counsel, for the most part, did not object to the prosecutor's argument in which the prosecutor stated defendant was lying or that he is a liar. However, counsel did object when the prosecutor asserted, "He has stolen before. This man is a thief. Look at him. He's dishonest." Irrespective, we cannot conclude the referenced statements regarding defendant's veracity amounted to misconduct.

"'''"[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness'" [citation], and he may 'use appropriate epithets….''''''" (*People v. Hill*, *supra*, 17 Cal.4th at p. 819.) Notably, our Supreme Court has held that "[r]eferring to testimony as 'lies' is an acceptable practice so long as the prosecutor argues inferences based on the evidence and not on the prosecutor's personal belief." (*People v. Sandoval* (1992) 4 Cal.4th 155, 180; see *People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 ["Referring to the testimony … of a defendant as 'lies' is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record"].)

And here, defendant's version of the charged incident, particularly his denial that he hit J.S. with his car, was directly contradicted by three eyewitnesses, supporting an inference that defendant's testimony was not true. Defendant also asserted he was not a "criminal" when he had previously been convicted of a crime and there was evidence to support an inference he committed the crimes charged in this case. Within this context, the prosecutor's argument that defendant was a liar was a fair comment on the evidence. (See *People v. Benton* (1979) 100 Cal.App.3d 92, 98 ["the prosecutor's … comment that

10.

appellant's witnesses were lying … is a permissible inference when the defense evidence is contradicted by the prosecution evidence" (fn. omitted)]; *People v. Edelbacher*, *supra*, 47 Cal.3d at p. 1030 [prosecutor did not improperly attack defendant's character during closing argument by referring to him, in part, as "'a pathological liar'" and "'one of the greatest liars in the history of Fresno County'"]; *People v. Schmeck* (2005) 37 Cal.4th 240, 298 [no misconduct in referring to defendant as a "'dope dealing lying rat'"]; see generally *People v. Sandoval*, *supra*, 4 Cal.4th at p. 180 ["Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence. In this case, the prosecutor's argument was based on the evidence and amounted to nothing more than vigorous yet fair argument"].) To the extent the prosecutor's comments suggested defendant committed perjury, for the same reasons, we cannot conclude the referenced comments were improper. Rather, they can be considered fair argument in response to defendant's testimony regarding his good character. (See *People v. Hines* (1997) 15 Cal.4th 997, 1062 [prosecutor's statement in closing argument that defendant was "'a perjurer and a liar'" and "'suborner of perjury'" "were an appropriate response to the evidence of defendant's good character"].) Additionally, evidence was introduced regarding defendant's past misconduct; that is, he admitted previously committing petty theft. Because defendant testified at trial, his veracity was an issue in the case, and the prosecution was permitted to discuss defendant's prior misconduct involving moral turpitude to impeach his credibility. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 295 ["nonfelony conduct involving moral turpitude should be admissible to impeach a criminal witness"].) Thus, we cannot conclude the prosecutor's argument regarding this evidence and the inferences to be drawn therefrom was improper. For these reasons, the referenced argument did not amount to misconduct.

## 2. *The prosecutor's other challenged comments were not prejudicial*

Defendant next argues the prosecutor claimed the "witnesses had pristine backgrounds, where a review of the transcription of the trial proceedings produced no evidence to support this assertion" or the prosecutor's comment that none of the witnesses had stolen before. He asserts the challenged comments suggested information other than the evidence admitted at trial supported the argument and, thus, were clearly misconduct. Defendant argues the comments violated his Sixth Amendment right to confrontation and were particularly prejudicial given that the testimony of the witnesses and their credibility was "paramount." The People concede "[t]here is no indication in the trial evidence that the [prosecution's] witnesses had 'pristine' backgrounds apart from any inference that could be raised by the fact that no criminal history was mentioned as to any witness apart from [defendant] himself." But they contend any alleged error was not prejudicial under any standard of review. We agree with the People.

First, as the parties acknowledge, a prosecutor may comment upon the credibility of witnesses based on facts contained in the record and any reasonable inferences that can be drawn from them, but may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record. (*People v. Martinez* (2010) 47 Cal.4th 911, 958; accord, *People v. Turner* (2004) 34 Cal.4th 406, 432–433.) Impermissible "vouching" of a witness may occur when a prosecutor places the government's prestige behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1207.)

While defense counsel generally objected when the prosecutor stated three prosecution witnesses had "pristine" backgrounds, he did not assert a basis for the objection. But defense counsel then objected to the prosecutor's statement that the witnesses had not stolen before, asserting "facts not in evidence," which the trial court overruled. However, there was no evidence presented at trial regarding the prosecution

12.

witnesses' criminal backgrounds.  Thus, to the extent the prosecutor was arguing that their backgrounds were "pristine" in this regard and that they had not stolen before, such statements were not supported by the evidence admitted at trial and, thus, amounted to misconduct.[2]

Nevertheless, we cannot conclude the challenged comments, even if they were improper, prejudiced defendant.  That is, the referenced comments did not render the trial "fundamentally unfair," and there is no reasonable probability the prosecutor's brief improper comments affected the verdict.  (See *People v. Turner*, *supra*, 34 Cal.4th at p. 433.)  The evidence in support of the jury's verdict is strong.  In addition to witness testimony, including defendant's admission that he threw milk on J.S., the jury was presented with surveillance footage of J.S. and defendant's interaction inside the store. And three independent prosecution witnesses testified they saw defendant drive his car into J.S.  The jury was instructed "to decide what happened in this case based only on the evidence" presented, and "what the attorneys say … during … arguments is not evidence."  Additionally, "Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.  Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discussed the case, but their remarks are not evidence; their questions are not evidence.  Only the witnesses' answers are evidence."

Considering the strong evidence implicating defendant, and that the jury was fully and repeatedly informed by the court's instructions that the attorney's statements are not evidence, we cannot conclude the brief comments in the prosecutor's closing argument

---

[2]It bears noting, however, that in discussing J.S. in closing argument, the prosecutor asserted:  "He's a reservist for the Army during his spare time.  He serves his country.  He wants to give back.  This is the kind of person that took the stand and testified, and this is the person whose credibility you have to judge.  A person with a pristine background, unlike defendant over here who has stolen before."  In fact, J.S. did testify he was in the Army Reserves and defense counsel did not object to this portion of the prosecutor's closing argument.

prejudiced defendant.  (See *People v. Medina* (1995) 11 Cal.4th 694, 761 [prosecutor's "few improper or inaccurate statements were not serious enough, even in the aggregate to have prejudiced defendant"].)

## II. The Court Did Not Abuse Its Discretion in Permitting the Referenced Cross-examination

Defendant also argues the prosecutor exceeded the scope of permissible cross-examination, resulting in prejudice.  We disagree.

### A. Relevant Background

During cross-examination, the prosecutor questioned defendant about details of the November 24, 2014, incident, including the exchange between defendant and J.S. inside the store.  The following exchange took place:

"Q You called him a racist?

"A He called me other things.

"Q You called him a racist?

"A I did try to understand at that moment the reason why he was acting or reacting towards me the way he was.

"Q You called him a racist?

"A Yes, I did.

"Q And you told him you were going to sue him for everything he's got?

"A No.  I said, 'I will … report you to the corporate for being racist with me or for … mistreating me as a customer the way you are.'

"Q You took out your phone?

"A Yes.

"Q And you tried to take a photo of [J.S.]?

"A No.  I did try to take a picture of his name tag.

"Q     Because you were going to report him?

"A     Because I was going to call the store and say, you know, this employee with the name of such and such did mistreated [*sic*] me so badly. That was the only intention."

On redirect examination, the following exchange took place between defense counsel and defendant:

"Q     [Defendant], what was your reason for starting to run when you were leaving the store?

"A     I felt scared because … he followed me, and then another gentleman behind him followed me.  I was not going to stay there, right?  I mean, I was scared.

"Q     So you were scared for your physical safety?

"A     Yes."

Then, on recross-examination, the prosecutor asked defendant, "So you just called him a racist inside the store?"  Defense counsel objected as "[o]utside the scope," and the trial court overruled the objection and told defendant he could answer.  Defendant responded, "I just didn't know what to think of why he was reacting that way?"  The prosecutor again asked defendant, "You called him a racist, [defendant]?"  Defense counsel objected, asserting the question was "[a]rgumentative."  The court overruled the objection and told defendant he could answer the question.  The following exchange then took place:

"Q     You called him a racist?

"A     Yes.  Because I thought that was the reason why he treated me the way he treated me.

"Q     So you called him a racist, and then you attacked him with an object?

"A     I didn't attack him with an object.  I did threw [*sic*] some milk.  Can I give an example?

"Q     No.  [¶] … [¶] You attacked him with an object?

15.

"A      With liquid.

"Q      So you were aggressive?

"A      I don't consider myself aggressive.

"Q      So attacking another person with an object, that's not aggressive?

"A      He made me upset at that moment.

"Q      So upset that you physically attacked him.

"A      I didn't attack him physically.

"Q      You did not throw an object at him?

"A      I didn't throw any objects or attacked him or touched him with my hands ever.

"Q      So you were violent with him?

"A      No, I wasn't.  I just threw some milk out of frustration.

"Q      So you call him a racist and you hit him with an object, and you're the one scared, [defendant]?

"A      He followed me.  He just stated today that he did serve—[¶] … [¶]

"Q      So you attacked him physically and you called him a racist and you called him offensive words, and you're the one who is scared?

"A      I didn't attack him physically because my hands never touched him.  My car never touched him."

## B.      Applicable Law

"It is generally recognized that the scope of cross-examination should be confined to matters which have been elicited from the witness on direct examination."  (*People v. Watson* (1956) 46 Cal.2d 818, 826; accord, *People v. Barrett* (2025) 17 Cal.5th 897, 974 ["'[A]part from matters affecting credibility, cross-examination of a witness is limited to the scope of the direct examination"]; see Evid. Code, § 761.)  Nevertheless, "[t]he

16.

permissible scope of cross-examination of a defendant is generally broad.  'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.  [Citation.]  A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies.  [Citation.]'"  (*People v. Chatman* (2006) 38 Cal.4th 344, 382; see generally *People v. Ramirez* (2022) 13 Cal.5th 997, 1127.)

We review the trial court's rulings on defendant's objections for an abuse of discretion.  (See *People v. Farley* (2009) 46 Cal.4th 1053, 1109–1110; see also *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

### C.    Analysis

Defendant contends the "prosecutor's repeated questions regarding racism, which was addressed fully on the initial cross-examination, was not for impeachment or to delve into any topic covered on re-direct, it was only to disparage [defendant] in the eyes of the jury, and was argumentative."  He further contends "[t]he consistent cross-examination of a topic with little to no relevance of the charged offenses had a substantial likelihood of influencing the verdict."  The People contend the prosecutor's cross-examination was relevant to the topics defendant testified to on redirect examination.  We cannot conclude the prosecutor's questions exceeded the scope of permissible cross-examination such as to constitute misconduct or that the trial court erred in failing to sustain defendant's objection.

"The prosecutor is entitled to attempt to impeach the credibility of a defendant's testimony [citation] and point out inconsistencies between his or her testimony and prior

17.

inconsistent statements. When a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and the scope of cross-examination is very broad." (*People v. Dykes* (2009) 46 Cal.4th 731, 764.)

Here, defendant took the stand and put his own veracity at issue. (*People v. Chatman*, *supra*, 38 Cal.4th at p. 383.) During redirect examination, defense counsel asked defendant why he started to run when leaving the store and defendant testified he was scared for his physical safety. The prosecutor was entitled to broadly explore the credibility of defendant's claim that he was scared after the incident in the store and why he ran from the store. The referenced cross-examination was a legitimate inquiry to clarify the circumstances that led up to defendant running from the store and exploring defendant's claim he was "scared" for his physical safety. That is, the prosecutor was entitled to counter defendant's testimony he was "scared" for his physical safety by questioning defendant regarding the circumstances that immediately preceded him running from the store and tended to establish defendant, in fact, was acting aggressively. (See *People v. Farnam*, *supra*, 28 Cal.4th at pp. 187–188 [prosecutor was entitled to ask defendant questions on cross-examination to rebut impression left by defendant's testimony].) Relatedly, we also cannot conclude the prosecutor's questions regarding whether defendant called J.S. a racist in context amounted to deceptive and reprehensible conduct or that defendant was prejudiced as a result. Rather, it is not reasonably probable a result more favorable to defendant would have been reached without the alleged misconduct. (See *People v. Tully*, *supra*, 54 Cal.4th at p. 1010.)

Accordingly, we reject defendant's contention the referenced cross-examination was improper or that the trial court abused its discretion in failing to sustain the defense's objection thereto. (See *Jennings v. Superior Court* (1967) 66 Cal.2d 867, 877 ["it is settled that even the cross-examination of a defendant who chooses to take the stand need not be 'confined to a mere categorical review of the matters, dates or times mentioned in the direct examination. [Citations.] It may be directed to the eliciting of any matter

18.

which may tend to overcome or qualify the effect of the testimony given by him on his direct examination'"].)

## III.    Cumulative Error

Defendant argues the cumulation of the numerous errors in this case prejudiced him.  "'However, we either have rejected his claims and/or found any assumed error to be nonprejudicial on an individual basis.  Viewed as a whole, such errors do not warrant reversal of the judgment.'"  (*People v. Tully*, *supra*, 54 Cal.4th at p. 1026; see *People v. Stitely* (2005) 35 Cal.4th 514, 560.)  Thus, we reject this contention.

## DISPOSITION

The judgment is affirmed.


PEÑA, J.

WE CONCUR:


DETJEN, Acting P. J.


DE SANTOS, J.

19.